In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2998

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff-Appellee,

v.

BOARD OF REGENTS OF THE UNIVERSITY
OF WISCONSIN SYSTEM,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 00-C-564-S--John C. Shabaz, Judge.

Argued February 15, 2002--Decided April 30, 2002

   Before ROVNER, DIANE P. WOOD, and EVANS,
Circuit Judges.

   EVANS, Circuit Judge.  This is a public
enforcement action brought by the United
States Equal Employment Opportunity
Commission (EEOC) under section 7 of the
Age Discrimination in Employment Act
(ADEA), 29 U.S.C. sec. 626. The EEOC
alleged that the Board of Regents of the
University of Wisconsin System (UW)
violated the ADEA when it terminated the
employment, on the basis of age, of four
persons working for the University of
Wisconsin Press. The EEOC prevailed in a
jury trial, bifurcated between liability
and damages. Following the jury
determination that there was a willful
violation of the Age Discrimination Act,
the UW moved for judgment as a matter of
law, as it did following the trial on
damages. Those motions and a motion for a
new trial were denied. The UW appeals
those rulings as well as an award of
costs to the EEOC. In addition, the UW
contends that it enjoys Eleventh
Amendment sovereign immunity which should
have barred this suit from even going to
trial.

   The University of Wisconsin Press is a
nonprofit organization associated with
the UW Graduate School and under the
direction of the UW Board of Regents. It

publishes scholarly books, journals, and periodicals, primarily in the humanities and the social sciences. The EEOC's case is based on claims by four "charging" parties:  Rosalie Robertson, who was 50 years old at the relevant time; Mary Braun, who was 46; Joan Strasbaugh, age 47; and Charles Evenson, who was 54. The university personnel who made the termination decisions were David Bethea, the interim director of the Press, and Steve Salemson, the associate director. Finding evidence of "ageism" in the terminations, the EEOC filed this action. We will save until later our discussion of what that evidence was and move first to the issue of sovereign immunity.

If this case was to be prosecuted in federal court, the EEOC had to do it. The individual charging parties were barred by the Eleventh Amendment from suing the state (and therefore the Board of Regents of the state university system). The Supreme Court determined in Kimel v. Florida Bd. of Regents, 528 U.S. 62 (2000), that the ADEA did not abrogate states' sovereign immunity to suits brought by individuals.

It is, however, a well-established principle that the fact that the states retain sovereign immunity from private lawsuits does not mean that they are protected from suit by the federal government. As the Court explained in Alden v. Maine, 527 U.S. 706, 755 (1999), "[i]n ratifying the Constitution, the States consented to suits brought by other States or by the Federal Government." The Court said that a suit brought against a state in the name of the United States "differs in kind from the suit of an individual." Id. See also Seminole Tribe of Fla. v. Florida, 517 U.S. 44 (1996). In extending the Kimel principle to the Americans with Disabilities Act (ADA), the Court stated that even though private suits were barred, the standards of the ADA can nevertheless be enforced "by the United States in actions for money damages . . . ." Board of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 374 n.9 (2001).

These cases have not ended the debate. The question arguably left open is whether all types of suits brought by the federal government may proceed against a state or whether the nature of the suit

determines whether the state enjoys Eleventh Amendment sovereign immunity. The UW points out that the case before us is one in which the Commission is merely seeking redress of individual acts of discrimination; the Commission is simply standing in the shoes of the individuals and is acting in privity with them as their representative. In other words, it is just a private suit dressed in fancy clothes. Therefore, the argument is, even though the EEOC would have the power to sue the states to remedy a pattern of intentional discrimination, the state retains immunity from this suit. If the individuals cannot sue, the EEOC should not be able to either.

Whatever wind might originally have been in the sails of this argument has been knocked out by EEOC v. Waffle House, Inc., 122 S. Ct. 754, decided earlier this year. In Waffle House, the EEOC brought an enforcement action under the ADA on behalf of a former Waffle House employee who signed a binding arbitration agreement. The issue presented for decision was "whether an agreement between an employer and an employee to arbitrate employment-related disputes bars the Equal Employment Opportunity Commission (EEOC) from pursuing victim-specific judicial relief . . . ." At 758. The Court of Appeals for the Fourth Circuit had distinguished between injunctive and victim-specific relief and determined that only when the EEOC seeks broad injunctive relief would the public interest overcome the goals of the Federal Arbitration Act. Rejecting this conclusion, the Supreme Court pointed out that once an EEOC charge is filed, the EEOC is in "command of the process" and has "exclusive jurisdiction over the claim for 180 days." If the EEOC chooses to file suit on its own, the employee retains no independent cause of action, although he may intervene in the EEOC's suit. The EEOC is, in other words, the "master of its own case" and the statute "confers on the agency the authority to evaluate the strength of the public interest at stake." It is the EEOC's job to determine whether public resources should be used to recover victim-specific relief. The Court concluded:

[W]e are persuaded that, pursuant to Title VII and the ADA, whenever the EEOC chooses from among the many charges filed

each year to bring an enforcement action in a particular case, the agency may be seeking to vindicate a public interest, not simply provide make-whole relief for the employee, even when it pursues entirely victim-specific relief.

At 765.

The only response left to the UW would be to say that sovereign immunity is different; it is more important than the FAA or arbitration agreements. That may be so. But when we read Waffle House together with the cautionary language of Garrett, which indicates that despite the fact that sovereign immunity bars private suits, the federal employment statutes can be enforced by the United States, we find little room in which to maneuver-- even were we inclined to. If ultimately Waffle House is to be distinguished from a case such as this one, that distinction should be drawn not by us, but rather by the Supreme Court. See Agostini v. Felton, 521 U.S. 203 (1997).

We will note, though, that granting the states immunity from suits by individuals but allowing suits by the EEOC is both a benefit and a curse for the states. It is a benefit because the EEOC brings only a few cases out of the thousands of charges filed, so the number of cases to defend against is vastly reduced. It is a curse because when the EEOC decides to bring a case, rather than facing an individual plaintiff, who almost certainly has limited resources, the state must square off against the power and majesty of the federal government. But whatever the policy arguments on either side of the issue, Waffle House compels us to find that sovereign immunity does not bar this suit, which is brought independently by an agency of the United States government.

Finding that the suit was properly before the court, we proceed to the merits and the appeal from the denial of the motions for judgment as a matter of law and for a new trial. In considering a motion for judgment as a matter of law, a court must review all the evidence in the record; it must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. 133, 150 (2000). Although the court should review the entire record, "it must disregard all evidence favorable to the moving party that the jury is not required to believe." Id. at 151. Furthermore, as a reviewing court, we must not substitute our view of the evidence for that of the jury. Massey v. Blue Cross-Blue Shield of Ill., 226 F.3d 922 (7th Cir. 2000).

In an age discrimination case, we evaluate whether there is evidence that the employer discriminated against the employees "because of" age. 29 U.S.C. sec. 623(a)(1). Reeves. Our task, then, is to examine the record to see whether there was evidence from which a reasonable jury could conclude that the "charging" parties were terminated "because of" their ages.

A claim of discrimination can be proven by the direct or indirect methods of proof. See Troupe v. May Dep't Stores, 20 F.3d 734 (7th Cir. 1994); Gorence v. Eagle Food Centers, Inc., 242 F.3d 759 (7th Cir. 2001). The indirect method is the familiar framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a paradigm designed to give plaintiffs a fair chance to prove discrimination when direct evidence of it is not available. But McDonnell Douglas has become a two-edged sword. We noted that irony in Gorence, where the plaintiffs argued that rather than helping them, McDonnell Douglas put too great a burden on them. Additionally, as this case shows, once a trial is completed, defendants may attempt to use the McDonnell Douglas framework as a shield. Here, the UW argues that the EEOC failed to establish a prima facie case because to do so, it had to show that the charging parties were replaced with persons at least 10 years younger. The EEOC says that the prima facie case is irrelevant at this stage of the proceedings.

Both sides have something to support their positions. We have said that

on post-trial review, whether Plaintiff's case is based on direct or indirect evidence, the McDonnell Douglas framework drops out of the analysis and we need only consider whether the record supports the resolution as to the ultimate

question of intentional discrimination.

Hasham v. California State Bd. of Equalization, 200 F.3d 1035, 1044 (7th Cir. 2000). Or:

After trial, the issue becomes whether the jury's verdict is against the weight of the evidence, with the focus being on whether there was sufficient evidence on the ultimate question of discrimination.

Dadian v. Village of Wilmette, 269 F.3d 831, 837 (7th Cir. 2001) (citations omitted). Yet in Reeves, which involved a post-verdict motion, the Court spent a good deal of time evaluating whether the evidence met the McDonnell Douglas criteria. But the Court also said, "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Reeves, at 153. As far back as 1983, in U.S. Postal Service Bd. of Govs. v. Aikens, 460 U.S. 711, 714, the Court found it "surprising" to have the parties arguing about the prima facie case after the case had been fully tried on the merits. These statements are not necessarily irreconcilable. There would seem to be no impediment to discussing a case based on indirect proof in terms of McDonnell Douglas. After all, that is what Reeves does. But ultimately the fact remains that what we are looking for is proof of intentional discrimination based on an examination of all the evidence in the record viewed in the light favorable to the nonmoving party. As we said in Massey, after trial we "need not tarry on the to's and fro's . . . ." of McDonnell Douglas. At 925.

Despite that, we will look briefly at UW's argument that the EEOC failed to make out a prima facie case because not all of the charging parties were replaced by persons at least 10 years younger. The argument grows out of O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308 (1996), which says that to make out a prima facie case of age discrimination, the claimant must be replaced by someone "substantially younger." Our decisions have defined "substantially younger" as 10 years younger. See Kariotis v. Navistar Int'l Transp. Corp., 131 F.3d 672 (7th Cir. 1997). The requirement applies to

the indirect McDonnell Douglas framework and the prima facie case. But even in thesummary judgment context in a McDonnell Douglas case, we have noted that the 10-year line is not indelible. In Hartley v. Wisconsin Bell, Inc., 124 F.3d 887, 893 (7th Cir. 1997), we said:

Yet the line we draw is not so bright as to exclude cases where the gap is smaller but evidence nevertheless reveals the employer's decision to be motivated by the plaintiff's age.

What is true on summary judgment is all the more true following a trial. Furthermore, here some of the persons hired were 10 years younger than the plaintiffs. We will turn to the other evidence.

Soon after Bethea became interim director, he came to the conclusion, as early as February 1999, that the Press was in financial trouble. Concluding that costs had to be cut, he decided it was necessary to terminate some employees. Working with Salemson, he set out to make a list of persons who would be let go. The list was prepared in March and included all of the charging parties, who were the oldest employees at the Press-- other than the two decision-makers themselves. An oversight committee approved the list and it was submitted to Ann Marie Lamboley, a senior administrative program specialist, who was the self-described "campus layoff expert." She instructed Bethea and Salemson to provide a written justification of the selection of the four people. As instructed and, notably, after the decisions had already been made, they prepared a document entitled "A Justification for the UW Press's Layoff Proposal." Bethea and Salemson then met with each of the charging parties on May 9, 1999, to inform them of their termination; each was told that the termination was "not in any way related to performance or personality issues." Each one was also given a copy of this document.

The unavoidable fact is that the four oldest employees were the only ones terminated, and the terminations occurred under circumstances from which one could, in fact, draw an inference that they were chosen because of their ages. These

workers were terminated and the responsibilities were taken over either by other employees or by replacements brought in from the outside, which supports an inference of discrimination. Robertson was terminated from the acquisitions department, and 2 weeks later the Press hired Sheila McMahon, who was in her mid-twenties, to work in acquisitions. Strasbaugh was 47 when she was terminated as assistant marketing manager. Her duties were assumed by a woman in her twenties or thirties, whose contract was renewed and extended shortly after Strasbaugh's termination. Evenson was 54 years old when he was terminated from his position as a senior marketing specialist, while 23-year-old Rebecca Gimenez was retained. Other people in their twenties and thirties were brought into the acquisitions and marketing departments as well.

The UW tries to distinguish between the charging parties and those retained or hired, saying they were not similarly situated to one another. But the "Justification" itself compares the charging parties and the other individuals working at the Press. For instance, the document discusses the relative skills of Evenson and Gimenez, both of whom worked in marketing. It also compares Robertson and the person retained in acquisitions.

Although the "Justification" was said to be an assessment of the skills and experience of the various people working at the Press, neither Bethea nor Salemson spoke with the charging parties about their skills. The two men did not solicit the opinions of managers regarding who should be let go. There were no formal employee evaluations. Documents they did look at included out-of-date resumes which had been on file at the Press, and these were not looked at until April, after the termination decisions had already been made.

The "Justification" can be read to show that they held the charging parties to a higher standard than the younger workers. It claims that Evenson would have to take courses to get "up to speed" on "Webpage programming or the electronic transfer of data and images." In the document there is no indication whether Gimenez, the preferred younger employee, herself had

taken such courses. The facts show she had not. Gimenez also received credit in the "Justification" for things she had not done. It says she created the Webpage, but, in fact, it had been created before she began working at the Press.

A reasonable jury could believe that the "Justification" uses code words which reflect an age bias. It refers to Evenson as having skills suited to the "pre-electronic" era and that he would have to be brought "up to speed" on "new trends of advertising via electronic means."

The UW also justifies the termination decisions by saying that the job titles of the newly hired younger people were different from those of the charging parties. Some of the people were hired as "limited term employees." We do not think that hiring individuals under less desirable terms can necessarily overcome the inference that the persons being replaced were replaced because of their ages.

There was also an interesting concept taking hold at the Press. Both Bethea and Salemson acknowledged during cross-examination that the Press was seeking a "new vision." Salemson conceded that the younger individuals brought into the Press were part of the new vision. Bethea wanted to hire replacements who would fit the new vision if he could jump the "legal hurdle" of the ADEA. He thought that in the past the Press had not "had the vision to be agile enough" and that the terminations of the charging parties would "improve that agility." It is certainly an interesting metaphor, from which the jury could reasonably draw an inference that in Bethea's mind youth and agility go hand-in-hand.

In addition to finding discrimination, the jury also found that the discrimination was willful. Under the ADEA, an employer's violation of the statute is willful if the "employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." Hazen Paper Co. v. Biggins, 507 U.S. 604, 614 (1993). A plaintiff does not need to show that the employer's conduct was "outrageous," nor does he need to provide direct evidence of the employer's motives. Mathis v.

Phillips Chevrolet, Inc., 269 F.3d 771 (7th Cir. 2001). An employer who truly violates the ADEA without knowing it and whose ignorance is not reckless is protected from a finding of recklessness. Wichmann v. Board of Trustees of Southern Ill. Univ., 180 F.3d at 804 (1999). As one might imagine, given the length of time the ADEA has been with us, a finding of nonreckless ignorance is rare.

The evidence was sufficient to allow the jury to infer that Bethea knowingly sought to circumvent the ADEA. We have already referred to his desire for agility and his attempt to jump legal hurdles. He conceded that the hurdles in cluded the ADEA. There is also evidence that the UW seemed recklessly to disregard whether its conduct was prohibited. Bethea, for instance, knew the ADEA was a hurdle, but neither he nor Salemson had been given any employment law training and neither man seemed to know the age at which the protections of the Act arose. In addition, even though the charging parties were the oldest people at the Press, Lamboley, the campus layoff expert, did not look at the terminations to see if age discrimination might have been involved. Neither did Associate Dean Mareda Weiss, who also did not know that the floor age of protection under the ADEA was 40. Nor did Dean Virginia Hinshaw, who also reviewed the proposed terminations. We have previously said that "leaving managers with hiring authority in ignorance of the basic features of the discrimination laws is an 'extraordinary mistake'" from which a jury can infer reckless indifference. Mathis, at 778.

The UW also contends that it should be granted a new trial, both on liability and damages. We review the denial of a motion for a new trial for a clear abuse of discretion. Hasham, at 1035. We see no reason to discuss further the liability phase of this trial other than to say that the denial of a new trial on liability was not an abuse of discretion. As to damages, the UW contends that the damage awards are clearly excessive, particularly because the charging parties failed to mitigate their damages. All four of the charging parties eventually found employment, but the primary basis of the argument is that the charging parties did not apply for openings at the

Press. But they had explanations for their failure to apply to the very organization which just terminated them. For one thing, after just being terminated for alleged deficiencies in their performance and skills, they had no reason to believe they would be hired if they did apply. Also, Braun testified that in addition to not being "overly sanguine" about being rehired by the organization which terminated her, she had moved to Oregon to accept another job. And, in fact, two of the charging parties did apply for jobs at UW, jobs they did not get. There is no evidence that any of the charging parties had been offered a job they did not accept.

A remark in the closing argument of counsel for the EEOC is also cited as a reason for a new trial. Counsel said, "We wouldn't be here unless the law had been violated." The remark was objected to; the objection was sustained and the jury instructed to disregard it. The statement was brief and was not repeated. Particularly, given that the UW bears the burden on this issue, Sheehan v. Donlen Corp., 173 F.3d 1039 (7th Cir. 1999), and that a motion for a new trial is, as we have said, reviewed for an abuse of discretion, we are far from inclined to reverse the decision of the district court on this point.

Finally, the UW contends that the travel and deposition costs of the charging parties and Dr. Sovan Tun, who was an expert witness, are not allowable and the court abused its discretion when it awarded these costs, which amounted to $5,516.99. It is true, as the UW argues, that the general rule in this circuit is that a court may not tax witness fees for party witnesses. The trouble is that the charging parties are not actual parties to the lawsuit. In fact, of course, the only reason the lawsuit can be tried is that the EEOC, not the individuals, is the plaintiff. Similarly, Dr. Tun, while he is a Commission employee, does not have a role in this lawsuit sufficient to make him a party.

The judgment of the district court is AFFIRMED.