# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
September 11, 2014

Lyle W. Cayce
Clerk

No. 13-50376

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

JAVIER GUERRERO, also known as Javi,

Defendant – Appellant

Cons. w/ No. 13-50379

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

JAVIER GUERRERO,

Defendant – Appellant

Appeals from the United States District Court
for the Western District of Texas

No. 13-50376

Before STEWART, Chief Judge, and WIENER and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

This is a consolidated appeal of two cases brought against Javier Guerrero, an individual the government alleged was the leader of the Texas Mexican Mafia in Uvalde. The first case, which involved racketeering charges including the commission of two murders in aid of racketeering, resulted in guilty verdicts and the imposition of five life sentences. As might be expected in a case with such high stakes on both sides, the appeal raises issues that run the gamut of a criminal proceeding. Guerrero raises a Fourth Amendment objection to cell tower records obtained during the investigation; challenges jurisdiction on the basis of his age; contends that the government engaged in discovery violations and constructively amended the indictment through the evidence it introduced at trial; objects to expert witnesses the government called at trial; and disputes that the evidence was sufficient to sustain one of the convictions.

While Guerrero was awaiting sentencing in the first case, he assaulted a correctional officer. That gave rise to his second federal criminal case. Because Guerrero pleaded guilty to the assault charge, his appeal in the second case focuses solely on the 210-month sentence he received.

Finding no error in either case, we affirm for the reasons discussed below.

## I.    Background Facts and Proceedings Below[1]

The bonds that tie a violent criminal operation together can be deadly to the general public. But when things go wrong internally, and those bonds fracture, the members of the operation are vulnerable to the fallout. This case is a prime illustration.

---

[1] Because the jury found Guerrero guilty on all counts, these facts are based on the testimony at trial viewed in favor of the government.

2

No. 13-50376

In the early 1980s, a group of Texas inmates formed a hierarchical criminal enterprise that they named the Texas Mexican Mafia.[2] San Antonio is its "capital," but it operates throughout Texas. Operations are funded by extortion; small-bit drug dealers are forced to pay the Mexican Mafia a 10% "tax," or "dime," on all of their proceeds from illegal drug sales. In exchange, the Mexican Mafia guarantees the dealers protection and allows them to sell drugs in Mexican Mafia–dominated areas. The group itself also traffics in illegal drugs.

The Mexican Mafia takes its organizational structure and its rules very seriously. Following the omertà code of the original mafia, perhaps the most important rule is that members cannot cooperate with law enforcement. Often, enforcing this and other membership obligations means committing murder.

Javier Guerrero was born in Uvalde, Texas, on July 20, 1988. Three of his older brothers—Carlos, Miguel, and Orlando—were longstanding members of the Mexican Mafia. At sixteen, Guerrero began his affiliation with the Mexican Mafia, and he rose quickly through its ranks. By seventeen, he was a sergeant, in charge of all operations in Uvalde. In June 2006, just before he turned eighteen, he planned a brutal home invasion of Geraldo Gonzales, a local drug dealer who had refused to pay the "dime."

One of the perpetrators of the Gonzales home invasion was Guerrero's friend, Chris Mendez. Mendez's girlfriend, whose brother is a detective, encouraged Mendez to turn himself over to authorities after the Gonzales incident. Guerrero and another Mexican Mafia member, Valdomero "Oso" Hernandez, found out about Mendez's apparent cooperation with authorities,

---

[2] The Texas Mexican Mafia is distinct from the Mexican Mafia, a criminal enterprise founded in a California prison in the late 1950s. But for simplicity's sake, the remainder of the opinion will refer to the Texas Mexican Mafia as the Mexican Mafia.

No. 13-50376

and considered him a snitch. (Incidentally, this was wrong—Mendez was actually taking the fall for the home invasion.) They asked for and received permission from William Davalos, the lieutenant ranked above Guerrero, to kill Mendez. Part of the reason this responsibility fell on Oso is that Oso was Mendez's sponsor, and according to Mexican Mafia policy, sponsors are required to kill their charges when such an act becomes necessary. Davalos was reluctant, but ultimately told them to "do what you need to do."

The Mendez murder occurred on December 2, 2006. That morning was the last time Mendez's girlfriend saw him alive. When Mendez and Guerrero came up to the drive thru at the restaurant where she worked, she noticed that Mendez was sad and avoided her gaze, and that Guerrero appeared uncharacteristically nervous. Mendez and Guerrero ordered coffees and left. At around 4:15 or 4:30 p.m. that day, Luis David Garza found Mendez's body in the middle of a road leading to Garza's ranch in Concan, Texas. Mendez had two bullet wounds in his head. Oso later told Nicholas Alvarez, another member of the Mexican Mafia, that he was the one who shot Mendez at close range. He also told Alvarez that Guerrero was with him and it annoyed him that Guerrero started making calls immediately after Mendez was shot.

Guerrero told two Mexican Mafia members who were beneath him in the hierarchy about the Mendez murder. He showed Chris Ortiz the criminal indictment in this case and said he was involved in "two of them," which Ortiz took to mean "murders." And he told Eli Valdez, who reported to Guerrero, that Valdez would be killed—like Mendez was—if he ever snitched.

Other evidence implicating Guerrero in the Mendez murder was introduced at trial. Historical cell site information indicated that Guerrero made five phone calls between 2:20 and 4:14 p.m. on the afternoon of the murder. One of the towers from which Guerrero's phone received service when he placed those calls is located 12.8 miles from the murder site. The

4

phone records indicate that between 4:30 and 5:00 p.m., Guerrero was moving east, and by 5:42, he was receiving service in the San Antonio area. This coincides with testimony from Guerrero's brother, Orlando, stating that he, Guerrero, and Oso met up at a Wal-Mart in San Antonio in the late afternoon that day. When they went back to Orlando's house, Guerrero and Oso threw out their shoes and Oso's shirt. Later that night, Orlando heard Oso weeping on the phone, telling his girlfriend, "Nah, babe, I can't believe I killed him. I can't believe – he's my road dog, carretera perro. We were so close together."

After authorities discovered Mendez's body, they discovered another dead body on the same ranch in Concan: Jesse "Pos Pos" Rodriguez. According to testimony at trial, Pos Pos was killed roughly a week before Mendez was and for the same reason. Orlando testified that he received orders to take out Pos Pos because Pos Pos was suspected of being an informant. But Guerrero was the one who orchestrated the murder.[3] Guerrero and three other Mexican Mafia members, including Orlando, stabbed Pos Pos until he bled profusely. Guerrero ran from the scene while the other three members shoved Pos Pos—still breathing—into a hole in the ground. They mixed up concrete and cement, poured it over Pos Pos's head, and buried him alive.

Soon after these murders, Guerrero was promoted to lieutenant. He had several jobs: collecting the dime from drug dealers; seizing taxes from individuals bringing undocumented aliens into the United States; and

---

[3] Guerrero and Orlando appear to have made separate plans to kill Pos Pos, and the one that went through was Guerrero's. It began when he ordered Orlando to drive towards Concan. On the way there, Orlando became convinced that Guerrero—his own brother—was going to kill him. His fears were not unfounded. When they arrived at the ranch, Guerrero pointed a gun at Orlando's back and shot. It apparently misfired, and that is when Pos Pos, who had arrived separately and had already suspected that he might be executed, started to run. The group chased him down and killed him.

supplying the Mexican Mafia with cocaine. In this new lieutenant role, he formally called a meeting on July 13, 2008, in Sabinal to discuss a problem: several drug dealers, including a man named Buck, were not paying the dime. Guerrero ordered a hit on Buck, and if the Mexican Mafia could not kill Buck, he told them, "fuck it, kill his brother Damian" Garza instead. He also ordered the murder of Valentin Mendoza, because he was not paying the dime, and Mexican Mafia member Jesse Carlos, because he was acting up and stealing. Five days later, Damian Garza was shot and killed by two Mexican Mafia members in front of his teenage daughter. The other hits Guerrero had ordered were thwarted. The plan to murder Mendoza was called off after one of the Mexican Mafia members assigned that task decided not to go through with it and alerted his probation officer to the plan.

On July 14, 2009, a federal grand jury indicted Guerrero and eleven others for various crimes related to the Mexican Mafia. All but two of those indicted—Guerrero and Victor "Youngster" Esquivel—pleaded guilty before trial. Guerrero and Esquivel were tried together.[4]

The five counts alleged against Guerrero were:

- Count One: Conspiracy to Conduct the Affairs of an Enterprise through a Pattern of Racketeering that included:
    o Murder of Christopher Mendez;
    o Murder of Jose Damian Garza;
    o Solicitation of Murder of Jesse Carlos;
    o Solicitation of Murder of Valentin Mendoza;
    o Conspiracy to Interfere with Commerce by Extortion; and
    o Conspiracy to Distribute Narcotics
- Count Two: Murder of Christopher Mendez in Aid of Racketeering

---

[4] Esquivel was also convicted. He appealed on the narrow issue whether evidence from an interview he gave to police should have been suppressed. A different panel of this court affirmed the district court, concluding that the officers had a valid reason to initiate a *Terry* stop and that the resulting interview was not an unlawful custodial interrogation. *United States v. Esquivel*, -- F. App'x --, 2014 WL 3362144, at \*1–2 (5th Cir. July 10, 2014).

- Count Three: Conspiracy to Murder Christopher Mendez in Aid of Racketeering
- Count Five: Murder of Jose Damian Garza in Aid of Racketeering
- Count Six: Conspiracy to Murder Jose Damian Garza in Aid of Racketeering

Counts Two and Five were capital charges, but the government declined to pursue the death penalty.

At trial, thirty-three witnesses testified against Guerrero, including William Davalos, Guerrero's brother Orlando, and five other Mexican Mafia members. Four witnesses the government designated as experts also testified. One, Robert Almonte, told the jury about a religious figure, known as the Santa Muerte, whom many drug traffickers along the United States-Mexico border keep close by because they believe she offers spiritual protection. Guerrero kept medallions and necklaces with an image of Santa Muerte at his home. Another expert, Victor Nguyen, interpreted the historical cell site information that indicated where Guerrero was when he placed calls on the afternoon that Chris Mendez was murdered. The jury found Guerrero guilty on all counts. He made two motions for new trial, both of which were denied.

While awaiting sentencing in the racketeering case, Guerrero was housed in the Val Verde County Correctional Facility in Del Rio. On October 25, 2011, he and inmate Jorge Abel Ramirez, also a Mexican Mafia member, assaulted a corrections officer named Daniel Dominguez. Guerrero chased down Dominguez and then kicked, grabbed, and kneed him. Ramirez joined in, striking Dominguez repeatedly on the head. Dominguez suffered a laceration on his forehead and abrasions on his face, nose, and back. The impetus behind the assault was that several days earlier, Dominguez had unplugged a television set that Guerrero and Ramirez were watching. He had taken away their television privileges because they would not return the

remote control as he had requested. Guerrero and Ramirez told Dominguez that it was disrespectful to warn them that they were not in charge.

On April 10, 2013, the district court sentenced Guerrero to life on all five counts in the racketeering case. The life sentences on Counts Two and Three (conspiracy to murder and murder of Chris Mendez) run concurrently, as do the life sentences on Counts Five and Six (conspiracy to murder and murder of Damian Garza). The life sentences on Count One (RICO conspiracy charge), Counts Two and Three, and Counts Five and Six run consecutively. Guerrero thus essentially received three consecutive life sentences.

The district court also handed down a sentence for the assault. It determined that Guerrero was not entitled to a reduction for acceptance of responsibility, even though he pleaded guilty, based on the following statement he made to probation about the assault:

> I feel very bad about what happened. But you know, we're men, and when you disrespect another man, you have to understand there are consequences. I feel bad about the whole situation and how it happened. It happened in the heat of the moment, and I wish cooler heads could have prevailed. I understand it was wrong and there are consequences.

The court also found that Guerrero was a career offender under the Sentencing Guidelines because he had "at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a). Those prior felony convictions were: (1) the racketeering offenses (counted together as one conviction); and (2) possession of cocaine with intent to distribute (a separate federal conviction from 2009). The resulting guideline range was 210 to 240 months, and the court imposed a 210-month sentence. These timely appeals followed.

No. 13-50376

## II.    Racketeering Case

### A. Historical Cell Site Location Data

Although Guerrero raises a number of issues concerning his racketeering case, we begin with the one that was the focus of his counsel at oral argument.    Guerrero asserts that the district court should have suppressed the historical cell site location data that roughly indicated where he was, or at least where his cell phone was, on the afternoon that Mendez was killed.[5]   That data revealing "the antenna tower and sector to which the cell phone sends its signal" was only available from third party communications providers.    *See In re Application of the U.S. for Historical Cell Site Data*, 724 F.3d 600, 602 (5th Cir. 2013).   Congress has mandated a specific procedure that the government must follow to obtain that data.   The Stored Communications Act requires that when the government seeks such records from a service provider, it must obtain a court order after submitting an application identifying "specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation."    18 U.S.C. § 2703(d). Guerrero contends, and the government concedes, that this procedure was not followed; the government obtained the data from state officials who themselves had used a subpoena, not a Section 2703(d) order, to receive the information.  The violation of the Act is clear.

Guerrero's problem is that suppression is not a remedy for a violation of the Stored Communications Act.   The Act has a narrow list of remedies,

---

[5] Guerrero filed a written motion to suppress on which he contends the district court never ruled.   But he acknowledges that when the cell tower evidence was offered into evidence, he did not reurge his suppression motion.  Based on our review of the record, it is clear that the district court denied the motion, even if it did not do so in a full written order.

and—unlike the Wiretap Act, *see* 18 U.S.C. § 2515—suppression is not among them. *See* 18 U.S.C. § 2707(b) (listing "appropriate relief" as "equitable or declaratory relief," "damages," and "reasonable attorney's fee and other litigation costs reasonably incurred"); 18 U.S.C. § 2708 (providing that the "remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter"); *see also United States v. Smith*, 155 F.3d 1051, 1056 (9th Cir. 1998) (concluding that suppression is not available under the Act); *United States v. Jones*, 908 F. Supp. 2d 203, 209 (D.D.C. 2012) (same). There is no basis for judicial imposition of the exclusionary rule for a statutory violation when Congress has not provided that remedy.[6] *See United States v. Clenney*, 631 F.3d 658, 667 (4th Cir. 2011) ("[T]here is no exclusionary rule generally applicable to statutory violations." (quoting *United States v. Abdi*, 463 F.3d 547, 556 (6th Cir. 2006))); *cf. Davis v. United States*, 131 S. Ct. 2419, 2426 (2011) (explaining that the exclusionary rule "is a 'prudential' doctrine created by this Court to 'compel respect for the constitutional guaranty,'" and is aimed at "deter[ring] future Fourth Amendment violations").

For Guerrero to suppress the cell site location data, he therefore must show that the cell site location data was obtained not just in violation of the Act, but also in violation of the Fourth Amendment. That constitutional question requires a separate inquiry, and it is one we recently addressed. In *Historical Cell Site*, we held that "Section 2703(d) orders to obtain *historical* cell site information for specified cell phones at the points at which the user places and terminates a call are not categorically unconstitutional." 724 F.3d at 615. We emphasized that cell phone users voluntarily convey information to their service providers and reasoned that they "understand that their

---

[6] Indeed, Guerrero conceded at oral argument that suppression is not an available remedy under the Act.

service providers record their location information when they use their phones at least to the same extent that the landline users in *Smith* [*v. Maryland*, 442 U.S. 735 (1979)] understood that the phone company recorded the numbers they dialed." *Id.* at 613. Although our holding in *Historical Cell Site* was decided only in the context of reviewing the denial of applications for Section 2703(d) orders, it nonetheless encompasses the exact issue before us now: whether *historical* cell site information—that is, a record that the "provider has already created"—is subject to a reasonable expectation of privacy that implicates the Fourth Amendment. *Id.* at 612; *see id.* at 615.

Rather than attempting to distinguish *Historical Cell Site* (an effort that would be unavailing for the reasons discussed above), Guerrero argues that the even more recent Supreme Court decision in *Riley v. California*, 134 S. Ct. 2473 (2014), is an intervening change in the law that requires us to depart from our prior holding. But "for a Supreme Court decision to change our Circuit's law, it 'must be more than merely illuminating with respect to the case before [the court]' and must 'unequivocally' overrule prior precedent." *Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 405 (5th Cir. 2012) (quoting *Martin v. Medtronic, Inc.*, 254 F.3d 573, 577 (5th Cir. 2001)).

*Riley* does not unequivocally overrule *Historical Cell Site*. In *Riley*, the question was whether the search-incident-to-arrest doctrine allows the government to search an arrestee's cell phone without a warrant. Based on modern cell phones' immense storage capacity, and because they can reveal the "sum of an individual's private life," the Court answered no. *Riley*, 134 S. Ct. at 2489, 2495.

Although the issues in *Riley* and in *Historical Cell Site* implicate a broader theme concerning the application of the Fourth Amendment to modern technology, they involve distinct doctrinal areas. *Cf. id.* at 2489 n.1

11

No. 13-50376

("Because the United States and California agree that these cases involve *searches* incident to arrest, these cases do not implicate the question whether the collection or inspection of aggregated digital information amounts to a search under other circumstances."). The *Riley* defendant indisputably had an expectation of privacy in the contents of his personal cell phone; the issue was whether the search-incident-to-arrest exception overcame that privacy interest for the contents of an arrestee's cell phone like it did for the contents of an arrestee's cigarette pack. *See United States v. Robinson*, 414 U.S. 218, 236 (1973) ("Having in the course of a lawful search come upon the crumpled package of cigarettes, [the officer] was entitled to inspect it . . . ."); *Riley*, 134 S. Ct. at 2484–85 (declining to extend *Robinson* "to searches of data on cell phones" because a "search of the information on a cell phone bears little resemblance to the type of brief physical search considered in *Robinson*"). *Historical Cell Site* involves the different question of whether a cell phone owner has a reasonable expectation of privacy in information held by a "third party" service provider. The Supreme Court recognized in *Riley* that these are different issues when it distinguished the seminal "third party" doctrine decision in *Smith*:

> The Government relies on *Smith v. Maryland*, 442 U.S. 735 (1979), which held that no warrant was required to use a pen register at telephone company premises to identify numbers dialed by a particular caller. The Court in that case, however, concluded that the use of a pen register was not a "search" at all under the Fourth Amendment. There is no dispute here that the officers engaged in a search of Wurie's cell phone. Moreover, call logs typically contain more than just phone numbers; they include any identifying information that an individual might add, such as the label "my house" in Wurie's case.

12

*Id.* at 2492–93 (internal citations omitted).[7]

This is not to say that the Supreme Court may not reconsider the third party doctrine in the context of historical cell site data or some other new technology. Since *Historical Cell Site* was decided, the Eleventh Circuit has ruled the other way, although in a decision vacated pending en banc review. *United States v. Davis*, 754 F.3d 1205, 1217 (11th Cir. 2014), *rehearing en Banc granted, vacated and rehearing en banc* granted, -- F. App'x --, 2014 WL 4358411 (11th Cir. Sept. 4, 2014) (distinguishing *Smith* and *Historical Cell Site* and holding that "cell site location information is within the subscriber's reasonable expectation of privacy"); *see also In re Application of the U.S. for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to the Gov't*, 620 F.3d 304, 317 (3d Cir. 2010) (distinguishing *Smith* on the ground that a "cell phone customer has not 'voluntarily' shared his location information with a cellular provider in any meaningful way"). It may be that the "technology is different" rationale that led the *Riley* Court to treat an arrestee's cell phone differently from his wallet will one day lead the Court to treat historical cell site data in the possession of a cellphone provider differently from a pen register in the possession of a pay phone operator. *See Riley*, 134 S. Ct. at 2488 ("The United States asserts that a search of all data stored on a cell phone is 'materially indistinguishable' from searches of these sorts of physical items. That is like saying a ride on horseback is materially

---

[7] The Court also raised the practical issue of cloud computing, or "the capacity of Internet-connected devices to display data stored on remote servers rather than on the device itself." *Id.* at 2491. The Court feared that allowing the government to look through a cell phone that contains information stored on the cloud would mean authorizing searches extending "well beyond the papers and effects in the physical proximity of an arrestee." *Id.* That broad of a search, the Court reasoned, "would be like finding a key in a suspect's pocket and arguing that it allowed law enforcement to unlock and search a house." *Id.* The Court's concerns were thus cabined to the unique circumstances of the search-incident-to-arrest doctrine, and did not overrule the separate line of cases, including *Smith*, dealing with information already in the possession of an identifiable third party.

indistinguishable from a flight to the moon." (citation omitted)).  Indeed, at least one Justice has expressed skepticism that *Smith* should apply to modern technologies, *United States v. Jones*, 132 S. Ct. 945, 957 (2012) (Sotomayor, J., concurring) ("[I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties."), and *Riley* recognized those concerns, *see* 134 S. Ct. at 2490 ("Historic location information is a standard feature on many smart phones and can reconstruct someone's specific movements down to the minute, not only around town but also within a particular building." (citing Justice Sotomayor's concurrence in *Jones*)).  And commentators have debated the effect *Riley* may have if a "third party" case involving modern technology were to end up at the Court.  *Compare, e.g.*, Daniel Solove, *The U.S. Supreme Court's 4th Amendment and Cell Phone Case and Its Implications for the Third Party Doctrine*, CONCURRING OPINIONS (June 25, 2014) ("Although the case involves searches incident to arrest and not other areas of the Fourth Amendment, the Court recognizes some key points about privacy and technology that *might* harbinger a change in some other Supreme Court doctrines [such as the third party doctrine]." (emphasis added)), *with* Barry Friedman, *How the Supreme Court Changed America This Year*, POLITICO MAGAZINE, at 3 (July 1, 2014) ("First, the *Riley* majority didn't touch the issue that's really on everyone's digital mind, the 'third party' doctrine. . . . That's where the real digital action is, but a footnote in *Riley* said the court was not going near the question.  Those who believe the justices will leap from *Riley* to overturning the third party doctrine are dreaming.").[8]

---

[8] These articles are available at http://www.concurringopinions.com/ and http://www.politico.com/magazine/story/2014/07/how-the-supreme-court-changed-america-this-year-108497.html.

No. 13-50376

The mere existence of that spirited academic debate, however, resolves our limited inquiry. In determining the effect of Supreme Court developments on our precedents, we do not read tea leaves to predict possible future Supreme Court rulings, but only decide whether an issued Supreme Court decision has "unequivocally" overruled our precedent. As discussed above and confirmed by the academic commentary, *Riley* did not overrule our decision in *Historical Cell Site*, or the Court's earlier *Smith* decision on which *Historical Cell Site* was based. *See also Ford v. State*, --- S.W. 3d ----, 2014 WL 4099731, at \*15 (Tex. App.—San Antonio Aug. 20, 2014) (concluding that *Riley* "does not concern the third party doctrine espoused" in *Smith* and is "otherwise inapplicable to the present situation involving a court order to obtain . . . business records of [defendant's] use of its cell tower network"). The district court thus properly admitted the historical cell site location data at trial.[9]

## B. Jurisdiction

Guerrero's next argument is also at odds with our precedent, and there is no intervening Supreme Court case that might even arguably call it into doubt. Guerrero contends that the district court lacked subject matter jurisdiction over Count One, the racketeering conspiracy charge, because the Juvenile Justice and Delinquency Prevention Act limits the government's power to try a juvenile—"a person who has not attained his eighteenth birthday"—in federal court. 18 U.S.C. § 5031. The Act's protections apply to defendants who have committed an offense prior to their eighteenth birthday unless they are over twenty-one when the indictment is returned. *Id.*

---

[9] Guerrero makes one additional suppression argument: that statements he made to police officers regarding his possession of a cell phone on the day Mendez was murdered should have been suppressed. That argument is waived because he raises it for the first time on appeal. *See United States v. Pope*, 467 F.3d 912, 918 (5th Cir. 2006).

No. 13-50376

Defendants below these age thresholds can only be tried in federal court if certain procedural preconditions are met; most prominently, the Attorney General must certify that a substantial federal interest exists in the case. 18 U.S.C. § 5032. The government concedes that it did not obtain certification in this case.

At first glance, Guerrero might appear to be a "juvenile" under the Act: he was sixteen when his involvement in the Mexican Mafia conspiracy began, and only twenty when the indictment was returned. But in *United States v. Tolliver*, we confronted, and rejected, the argument Guerrero makes now: that a defendant cannot be tried on a conspiracy charge in federal court if he entered into a conspiracy before he turned eighteen. 61 F.3d 1189, 1200 (5th Cir. 1995), *judgment vacated on other grounds by Moore v. United States*, 519 U.S. 802 (1996). Instead, we adopted the following rule: "after he turns 18, a defendant may be tried for a conspiracy which temporally overlaps his eighteenth birthday—if the government can show that the defendant ratified his involvement in the conspiracy after reaching majority." *Id.* Ratification in this context simply means that a defendant "continu[es] to participate in an ongoing conspiracy after his 18th birthday." *United States v. Peters*, 283 F.3d 300, 309 (5th Cir. 2002). We recently reiterated *Tolliver*'s rule that post-eighteen conduct is sufficient to support a jury's verdict against a defendant charged with conspiracy. *See United States v. Harris*, 740 F.3d 956, 966 (5th Cir. 2014) (affirming conviction of defendant for conspiracy to possess firearms in furtherance of a drug-trafficking crime).

There was sufficient evidence for the jury to conclude that Guerrero ratified his involvement in the RICO conspiracy after he turned eighteen. *See Tolliver*, 61 F.3d at 1200. Indeed, four of the six alleged RICO predicate offenses—the murders of Christopher Mendez and Damian Garza, and the solicitations of murder of Jesse Carlos and Valentin Mendoza—occurred after

16

Guerrero turned eighteen. The other two alleged predicate acts, extortion and narcotics distribution, were both supported with significant evidence of post-eighteen conduct. For instance, the murders Guerrero ordered at the July 2008 meeting in Sabinal were tied to the victims' failure to pay the dime. Finally, an FBI agent testified that Guerrero attempted to sell him cocaine in November 2006, when Guerrero was over eighteen. In light of this considerable evidence of post-eighteen engagement in the RICO conspiracy, the district court had jurisdiction to try Guerrero on that charge.

### C. Sufficiency of the Evidence

The next issue Guerrero raises is whether the jury could reasonably have found him guilty of Count Two, the murder of Chris Mendez in aid of racketeering. Guerrero notes that his DNA was not found at the murder scene and also argues that the cell site location data bolsters his case by placing him 45 miles away from the murder scene around the time Mendez was killed.

In conducting our *de novo* review of the sufficiency of the evidence, "we review all evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt." *Harris*, 740 F.3d at 962 (quoting United States v. Shum, 496 F.3d 390, 391 (5th Cir. 2007)). Viewing the evidence in the light most favorable to the verdict, the jury could have found the following:

- Guerrero thought that Mendez was a snitch;
- Guerrero asked his superior, William Davalos, for permission to carry out the murder;
- Guerrero killed Pos Pos, a Mexican Mafia member, approximately a week before Mendez was killed, and the body was found in almost the same place where Mendez's was;
- Guerrero was last seen with Mendez on the day of his murder;

No. 13-50376

- That day, Mendez's girlfriend noticed that Mendez looked sad and Guerrero, uncharacteristically, appeared nervous;
- Guerrero was with his brother Orlando in San Antonio late in the afternoon on the day of the murder, and Orlando saw Guerrero throw out clothes that were still wearable;
- Oso told a Mexican Mafia member that Guerrero was present when Oso shot Mendez;
- Orlando heard an anguished Oso talking on the phone to his girlfriend about how hard it was for him to kill one of his best friends; and
- In an effort to bolster his reputation in the group, Guerrero told two lower ranking Mexican Mafia members that he killed Mendez.

This evidence is more than sufficient to support the jury's verdict despite the lack of incriminating DNA. Furthermore, the disputed cell phone tracking data could have cut against Guerrero. The evidence showed that Guerrero's phone was receiving service from a cell tower within 12.8 miles of the murder location from 2:17 to 4:14 p.m. Evidence indicated that the murder occurred around or prior to 4:15. The jury could reasonably have concluded that Guerrero was near the murder site around 4:15 and then left the area to stay with his brother in San Antonio. Based on the totality of this evidence, "a reasonable trier of fact could have found the evidence proved the [crime] beyond a reasonable doubt." *Harris*, 740 F.3d at 963.

### D. Discovery Concerns

Next, Guerrero argues that the government failed to disclose impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). First, he contends that the government failed to disclose two matters regarding witness Davalos, Guerrero's superior in the Mexican Mafia: (1) that Davalos admitted to

18

committing three murders[10]; and (2) that Davalos had an agreement with the state district attorney to testify against Guerrero in exchange for immunity. Guerrero also asserts that the government should have disclosed evidence that his brother Orlando was involved in a prison riot. After reviewing these claims *de novo* but affording deference to the district court's factual findings, *see United States v. Brown*, 650 F.3d 581, 589 (5th Cir. 2011), we conclude that no *Giglio* violations occurred. The district court found that the government did disclose relevant information about Davalos, which is consistent with the codefendant's cross examination of Davalos which elicited this information. And the district court rejected Guerrero's concerns about Orlando's involvement in the prison riot because Guerrero was likely the one who instructed Orlando to instigate it. The court therefore determined that the prison riot evidence was inculpatory, rather than exculpatory. *See United States v. Nixon*, 881 F.2d 1305, 1308 (5th Cir. 1989) (holding that "neutral or inculpatory evidence lies outside" *Brady* coverage). We see no ground to disturb the district court's thorough findings on these issues.

For the first time on appeal, Guerrero seeks production under the Jencks Act of certain witness statements that he alleges were not disclosed to him. The Jencks Act, 18 U.S.C. § 3500, "requires the government to release to the defendant, after a witness's direct examination, any statement of the witness in the government's possession which relates to the subject matter of the witness's testimony." *United States v. Merida*, 765 F.2d 1205, 1215 (5th Cir. 1985). Guerrero identifies three categories of statements that he contends the government should have disclosed: (1) recorded jail calls made

---

[10] There is some confusion over the three murders to which Guerrero is referring. The government did disclose that Davalos had murdered a man nicknamed Smiley, and had agreed to murder Pos Pos and Chris Mendez. The district court found that the government did not know of any additional murders beyond those listed above, and that finding is supported by the evidence.

by Orlando; (2) statements by Eli Valdez to a probation officer and a Department of Public Safety Officer; and (3) statements made by William Davalos. There is a preliminary question of whether any of these statements, especially ones made to a probation officer or that rest in the hands of the Bureau of Prisons, qualify as "statements" in the possession of the prosecution team under the Jencks Act. *See United States v. Brown,* 303 F.3d 582, 591–92 (5th Cir. 2002) ("A 'statement' includes a 'written statement made by said witness and signed or otherwise adopted or approved by him.'" (quoting 18 U.S.C. § 3500(e)(1))); *United States v. Trevino,* 556 F.2d 1265, 1271 (5th Cir. 1977) (concluding that a statement in the sole possession of the probation officer was not in the possession of the prosecution). But we need not address those concerns. Guerrero failed to seek production of these items during trial. That failure deprived the district court of an opportunity to "take whatever steps were necessary to determine if [statements were] in the government's possession" and means there is no record for us to review. *United States v. McKenzie,* 768 F.2d 602, 608 (5th Cir. 1985); *see also United States v. Hodgkiss,* 116 F.3d 116, 119 (5th Cir. 1997) ("A defendant who fails to alert the trial judge that he believes the government has failed to produce a statement covered by the Jencks Act waives his rights to such production."), *vacated and remanded on other grounds,* 522 U.S. 1012 (1997); *see generally United States v. Knapp,* 25 F.3d 451, 461 (7th Cir. 1994) (citing cases holding that Jencks Act claims are waived when not properly preserved at trial). For example, when Valdez testified that he spoke to probation, Guerrero's counsel never requested any such statements from the government. The district court therefore had no opportunity to determine whether any written statements to probation existed and whether they were in the possession of

No. 13-50376

the prosecution team.  For these reasons, Guerrero has waived the Jencks Act issue.[11]

### E. Remaining Trial Issues

Guerrero raises several issues relating to the introduction of evidence at trial.  First, he contends that the government constructively amended the Indictment by introducing evidence of the Pos Pos murder and acts of extortion and drug trafficking that Guerrero committed when he was seventeen.  Constructive amendment occurs when a defendant could be "convicted upon a factual basis that effectively modifies an essential element of the offense charged or permits the government to convict the defendant on a materially different theory or set of facts than that with which []he was charged." *United States v. McMillan*, 600 F.3d 434, 451 (5th Cir. 2010); *see, e.g., Stirone v. United States*, 361 U.S. 212, 217–18 (1960) (holding in a seminal constructive amendment case that "when only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another"); *United States v. Young*, 730 F.2d 221, 224 (5th Cir. 1984) (citing *United States v. Salinas*, 654 F.2d 319 (5th Cir. 1981), as an example of constructive amendment, in which the indictment stated that the defendant aided one officer in misapplying bank funds, when the evidence showed that a different officer had approved the improper loan at issue).  That did not occur here.  The jury charge was very clear; it set out in specific terms what crimes and predicate acts Guerrero was charged with committing.

---

[11] Guerrero also raised alleged violations of Federal Rule of Criminal Procedure 16, which requires the government to disclose evidence during discovery, for the first time on appeal in his Reply Brief.  In addition to being forfeited, these arguments are unavailing for two reasons: (1) Rule 16(a)(1)(C), on which Guerrero relies, only pertains to organizational defendants; and (2) Guerrero provides no evidence that he made a request for evidence under Rule 16 that the government did not follow.

Guerrero's argument is more properly classified as an evidentiary objection under Rule 404(b) that the evidence was used to show his bad character.  But our precedent is clear that the "government is not limited in its proof of a conspiracy or racketeering enterprise to the overt or racketeering acts alleged in the indictment." *United States v. Krout*, 66 F.3d 1420, 1425 (5th Cir. 1995).  Moreover, evidence "of an uncharged offense arising out of the same transactions as the offense charged in the indictment is not extrinsic evidence within the meaning of Rule 404(b)." *Id.* (quoting *United States v. Maceo*, 947 F.2d 1191, 1199 (5th Cir. 1991)).  Admission of the challenged evidence thus was not improper nor resulted in a constructive amendment of the charges.

Guerrero also objects to the district court's admissions of Robert Almonte and Victor Nguyen as expert witnesses.  The district court issued a cogent, detailed opinion explaining why it qualified Almonte and Nguyen as experts, and those decisions survive abuse of discretion review.  *See United States v. Norris*, 217 F.3d 262, 268 (5th Cir. 2000) (stating that *Daubert* decisions are subject to abuse of discretion review and are not disturbed unless "manifestly erroneous").

### III.   Assault Case

That brings us to Guerrero's second case, in which he pleaded guilty to assaulting a correctional officer while detained pending sentencing in the racketeering case.  Guerrero claims two errors in the district court's handling of the sentence in the assault case: first, that he should have received a two-point reduction in the guideline range for acceptance of responsibility; and second, that he should not have been classified as a career offender.

A district court's factual determination that a defendant has not accepted responsibility is subject to "great deference." *United States v. Vital*, 68 F.3d 114, 121 (5th Cir. 1995).  Indeed, the "sentencing judge's factual

determinations on acceptance of responsibility are entitled to even greater deference than that accorded under a clearly erroneous standard." *United States v. Maseratti*, 1 F.3d 330, 341 (5th Cir. 1993). In the statement he offered to demonstrate acceptance, Guerrero told probation that he felt the corrections officer disrespected him, and that men have to understand the consequences of disrespecting another man. Given that statement, the district court was well within its discretion to find that Guerrero did not accept responsibility. *Cf. United States v. Brigman*, 953 F.2d 906, 909 (5th Cir. 1992) (per curiam) ("Grudgingly cooperating with authorities or merely going through the motions of contrition does not oblige a district court to grant an unrepentant criminal the two-step reduction."); *see also, e.g.*, *United States v. Silva*, 1993 WL 481588, at *2 (5th Cir. Nov. 3, 1993) (unpub.) (affirming district court's conclusion that the defendant "had not demonstrated an acceptance of responsibility because 'he attempt[ed] to lay all or some of the blame on the shoulders of his other unnamed drug dealers who were allegedly threatening him'" (alteration in original)).[12]

Guerrero's guideline range was significantly increased because the district court classified him as a career offender—a defendant who has "at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a). As that guideline explains,

> The term "two prior felony convictions" means (1) the defendant committed the instant offense of conviction subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense (*i.e.*, two felony convictions of a crime of violence, two felony convictions of a controlled substance offense, or one felony conviction of a crime of violence and one felony conviction of a controlled substance offense), and (2) the sentences for at least two of the

---

[12] Our unpublished opinions issued prior to January 1, 1996 are precedential. *See* 5th Circ. Rule 47.5.

aforementioned felony convictions are counted separately under the provisions of § 4A1.1(a), (b), or (c).

U.S.S.G. § 4B1.2(c). "[P]rior sentences are counted separately unless (A) the sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day." U.S.S.G. § 4A1.2(a)(2); *see* U.S.S.G. § 4B1.2 n.3 ("The provisions of § 4A1.2 (Definitions and Instructions for Computing Criminal History) are applicable to the counting of convictions under § 4B1.1."). The government concedes that Guerrero's convictions in the racketeering case must be counted together because the "sentences resulted from offenses contained in the same charging instrument." But that is not Guerrero's only conviction; he was also convicted of possessing cocaine with intent to distribute in 2009, and sentenced for that offense in September 2012. The issue is whether those convictions—one for the racketeering case cumulatively, and one for the cocaine possession—are "two prior felony convictions" even though Guerrero had not been sentenced for either one when he assaulted the correctional officer in 2011. Guerrero argues that the language in section 4B1.2(c), referring to sentences, rather than convictions, indicates that they do not count for career criminal enhancement purposes.

Guerrero's argument lacks support in the structure and text of the amended guidelines and the way our sister circuits have interpreted them. First, the career offender guideline itself provides that the "date that a defendant sustained a conviction shall be the date that the guilt of the defendant has been established, whether by guilty plea, trial, or plea of *nolo contendere*." U.S.S.G. § 4B1.2(c). Moreover, the general criminal history guidelines are clear that when "a defendant has been convicted of an offense, but not yet sentenced, such conviction shall be counted as if it constituted a prior sentence under § 4A1.1(c) if a sentence resulting from that conviction

otherwise would be countable." U.S.S.G. § 4A1.2(a)(4). Three of our sister courts in published opinions, and one in an unpublished opinion, have analyzed this guideline language and held that prior convictions for which a defendant has not yet been sentenced still count as "convictions" in determining career offender status. *See United States v. French*, 312 F.3d 1286, 1287 (9th Cir. 2002) (per curiam) ("By its plain language, § 4B1.2(c) requires that a conviction be considered a qualifying predicate offense effective from the date that a guilty plea is entered, regardless of whether a sentence has been imposed."); *United States v. Gonzales*, 220 F.3d 922, 926 (8th Cir. 2000) ("We believe, therefore, that an unsentenced guilty plea is a 'prior conviction' for purposes of § 4B1.1."); *United States v. Pierce*, 60 F.3d 886, 892 (1st Cir. 1995) (holding that *nolo contendere* plea and subsequent withheld adjudication was "conviction" because "[a]lthough there is surface appeal to the argument that there can be no 'conviction' unless and until a final adjudicatory judgment is entered, the sentencing guidelines clearly construe the term differently"); *see also United States v. Riley*, 1998 WL 669935, at *1 (6th Cir. Sept. 17, 1998) ("The date that a defendant sustained a prior felony conviction shall be the date that the guilt of the defendant was established, whether by guilty plea, trial, or a nolo contendere plea."). What matters for career criminal enhancement purposes is thus the conviction, and not the sentence that follows. Accordingly, the district court correctly classified Guerrero as a career criminal and there is no error in the sentence.

## IV.    Conclusion

Trials like Guerrero's racketeering case test the mission of the federal courts to provide a fair forum for adjudicating criminal charges. In this case, the district court handled that challenge in an exemplary manner. It devoted significant attention to the issues, often issuing detailed explanations for its decisions. The district court's dutiful and impartial application of the

relevant law allowed the jury to reach a considered, untainted result. Guerrero presents no ground to disturb the result of the trial or the sentence in his assault case. We therefore AFFIRM the district court in both cases.