# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
August 11, 2020

Lyle W. Cayce
Clerk

No. 19-30619

UNITED STATES OF AMERICA,

　　　　　Plaintiff - Appellee

v.

LONNIE D. JOHNSON, also known as D-Money;
LARSHANDRA DAVENPORT, also known as Shonda Morris;
JIMMIE R. DURDEN, JR.; GARY J. MCCAIN, also known as RoRo;
DEMARCUS D. MORRIS, also known as GG, also known as Gezzy,

　　　　　Defendants - Appellants

Appeals from the United States District Court
for the Western District of Louisiana
USDC No. 5:17-CR-173-4

Before JOLLY, JONES, and WILLETT, Circuit Judges.

PER CURIAM:*

In this direct criminal appeal, defendants-appellants raise ten challenges to their convictions of racketeering, drug conspiracy and distribution, and possession of a firearm by a felon. Finding no error, we reject all challenges and **AFFIRM**.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 19-30619

## BACKGROUND[1]

This case revolves around the Block Boyz, a Shreveport rap group turned criminal enterprise. The Block Boyz was largely a family affair; it was led by Demarcus Morris[2] and his brother Frank, with their mother, Larshandra Davenport, providing protection and a home base. Jimmie Durden, who had a child with Morris's sister, was a member of the Block Boyz as was Lonnie Johnson, a cousin. The final member of the cohort implicated in the case at bar is Gary McCain, a family friend. Over the course of several years, the Block Boyz engaged in shootouts, robberies, and drug deals, all in the pursuit of wealth. A mountain of evidence, much of which is detailed below, was presented over the course of a lengthy trial, culminating in convictions for Johnson, Morris, Durden, and Davenport of conspiracy to participate in the affairs of a racketeering enterprise; Morris, Durden, McCain, and Davenport of conspiracy to distribute controlled substances; Morris of distributing crack cocaine; Durden, McCain, and Morris of possessing a firearm while a felon; and Davenport of distributing powder cocaine.

The Block Boyz began in 2010 when Frank Morris and Lonnie Johnson, along with a few friends, decided to start a rap group. The group quickly grew to include Demarcus Morris, Jimmie Durden, and Gary McCain, among others. As the group expanded, its purpose devolved from producing rap music to selling drugs and engaging in robberies. Predictably, guns got involved as the Block Boyz took "care of each other" and staved off rival gangs. They were a tightknit group, quick to defend one another and quick to exclude someone if

---

[1] The evidence presented at trial included recorded calls between co-defendants and between government informants and the defendants. Transcripts of these calls were not included in the record on appeal. But the government's brief quoted pertinent portions of the calls, and the defendants do not challenge the accuracy of the government's recitation.

[2] Any reference to Morris hereinafter is a reference to Demarcus Morris.

2

No. 19-30619

they "stopped hustling." To identify themselves, the group wore red, got tattoos, and posted photos and status updates together on social media, sometimes while wearing red or in "Blockboy" t-shirts.

Many of the Block Boyz's shenanigans were geared towards obtaining and selling drugs. The groups' earliest documented involvement with drugs occurred on January 26, 2011, when, during a traffic stop, officers seized 60 grams of marijuana and 60 dosage units of ecstasy pills from Durden's pocket. Three years later, officers stopped Frank Morris, who was driving with other members of the Block Boyz, and found a loaded Mac 10 submachine gun, three loaded handguns, 40 grams of marijuana, Xanax, and digital scales. In January 2016, officers stopped Demarcus Morris after a hit-and-run; they found 100 bags of crack cocaine, a loaded gun, approximately $1,700 in cash, and digital scales. A few months later, officers apprehended McCain while he was driving Morris's car and discovered a loaded assault rifle and marijuana.

Between May 5, 2016 and June 22, 2016, a government informant, Q.T., made six controlled crack purchases from Morris and attempted a seventh. Morris—or McCain, who accompanied Morris—was often armed during these transactions. Cocaine was sometimes delivered by a third party to Morris, who in turn offered to cook it into crack for Q.T.; Q.T. paid Morris extra for this service. In addition to buying crack from Morris, Q.T. purchased a shotgun.

On July 14, 2016, Durden's aunt, Rhonda Noyes, called Morris to tell him that she had a source for "some soft [powder]." Morris relayed the message to Durden. The next week, Davenport called Morris to tell him that a buyer was waiting to get a "dime" from him. Four days later, Morris sent Durden to make a drug sale. On July 28, Morris called a seller to ask about the price of "snow." A week later, he called another seller to inquire about drug availability. Morris and the seller met shortly thereafter. That same day, Morris placed a call seeking "another four." A seller agreed to "hook y'alls boys up," and the two

3

agreed on a meeting spot.  These types of calls continued the next day, including a call between Davenport and Morris during which Davenport informed Morris that she had a buyer who was looking for marijuana.  Two days later, Morris helped Davenport sell 116 15-milligram pills of Roxicodone.  Between April 25 and June 26, 2017, Q.B., a police informant, bought powder cocaine from Davenport four times.

Morris and Durden tried to conceal their drug dealings from police.  On July 28, 2016, Durden called Morris to warn him that police were seeking a warrant for Davenport's home.  Morris responded that they needed to go "clean" the home and move supplies to "Granny's house"—also referred to as the Midway house—where Morris's grandmother and his brother, Frank, resided.  Three hours later, a member of the Block Boyz called Morris to tell him that the police were searching the Midway house instead.  McCain was also made aware of this change.  From the Midway house, police seized a backpack filled with one-gallon bags containing residue, digital scales, counterfeit money, ammunition, a gun, a 30-round magazine for a rifle or AR pistol, and a case for a .40 caliber gun; they also arrested Frank Morris.

As the above facts suggest, the Block Boyz regularly handled and dealt guns.  Morris, in particular, was prone to engage in trade discussions and barter for firearms.  For instance, on August 2, 2016, Robert Cannon, another member of the Block Boyz, told Morris he had someone who wanted to sell "some ninety nines"—"the model them cops had with the night vision scopes"—for "two fifty."  Morris responded that he wanted one.  Cannon later told Morris to have McCain meet him at a convenience store, the Stop-N-Fly, with cash.  That same night, Cannon asked Morris if McCain wanted to trade his Glock for "[t]hat Uzi and two dollars";  Morris said he would have McCain contact Cannon.  Durden was also involved in gun transactions.  He had discussions

with Morris about acquiring firearms and occasionally would run pick-ups for Morris.

The Block Boyz used their guns to fight rival gangs and to conduct robberies. The earliest documented gun fight involving a member of the Block Boyz occurred in May 2012. McCain, who was dressed in "all red," was shot while at a club. He responded by firing a gun at individuals in a Crown Victoria, shooting one person in the head and another in the face. McCain also shot at rival gang members on December 13, 2013. While riding as a passenger in a car, he was shot at and fired back. McCain's car had multiple bullet holes in it, caused by shots fired from both inside and outside the vehicle.

In May 2012, both Johnson and Morris fired guns during fights with rivals. Johnson hit someone in the leg and Morris assaulted a pregnant woman. On August 18, 2012, Durden shot at Jacorvin Taylor at the Stop-N-Fly. In 2016, Durden and Morris were recorded discussing shooting a member of a rival gang, the Trap Boyz. Later that year, several men shot at an apartment complex where McCain, Durden, and Morris lived. In a series of calls, Davenport discussed the shooting with Morris and McCain and discovered that police were looking for Morris's car. The car was hid at Morris's aunt's house.

On July 26, 2016, a member of the Trap Boyz "tried to get at" Morris and Durden. Morris called around see if anyone had seen "that little red car" and asked to borrow a truck. Later that day, the police, responding to a call reporting gunfire, found a red Dodge truck with bullet holes in it. Morris boasted to a friend the next day about the shooting, mocking the Trap Boyz as terrible shots. Despite having escaped injury-free, Morris was upset by the shooting and mentioned to Durden that they should gun down the rival gang. Morris acted on that threat, but with no success. Conflict with the Trap Boyz

No. 19-30619

extended into the prisons, where McCain and a rival gang member got into a brawl.

Robberies were another central feature of the Block Boyz's enterprise. On January 28, 2014, Adams, a member of the Block Boyz, dropped off Johnson and Morris's cousin, Hammer, at the Kings Manor apartments. A few minutes later, Adams heard gunshots before seeing Johnson and Hammer running back to the car. According to Kameshia Martin, whose home Johnson and Hammer targeted, two men entered her bedroom through the window while she was asleep. One of the men held a gun on Martin while the other went through the apartment taking, among other things, a laptop and a phone.[3] Martin, who had a gun under her pillow, eventually was able to fire at the intruders; they returned fire, shooting Martin three times. Officers found shell casings and bullet holes throughout Martin's apartment. They also discovered that Martin's fiancé's car (where a gun was stored) had been broken into. Johnson later admitted to friends that he had broken the car window to steal the gun.

Hammer, Johnson, and Adams were involved in a second armed robbery that night. After meeting up with Morris, the group traveled to the Briarwood Apartments. They had received word that one of the residents had "a lot of dope" and money. Residing at the Block Boyz's targeted apartment was Deandre Jackson, his girlfriend, his mother, his brother, and two younger siblings. Hammer and Johnson, both wearing masks, came into the apartment; one held a gun to Jackson's head, took him into another room, demanded money, and fired a shot into the air. At some point, either Hammer or Johnson began shooting, and Jackson's brother returned fire. Hammer was killed, Jackson's brother was shot in the head, and Johnson was shot in the leg. Adams, Johnson, and Morris fled the apartment complex, leaving behind

---

[3] The phone was later found in the trash at the Midway house.

6

their guns and masks and driving away in a tan SUV.  They returned to the Midway home, where Morris's grandmother wrapped Johnson's leg.

Johnson, Morris, and several others later tried to drive from the Midway house to the hospital in the tan SUV but were stopped by police.  Police seized a loaded assault rifle and a blood sample from the SUV; the DNA matched Johnson.  DNA from blood on the bedroom floor of the Midway house also matched Johnson.

On July 14, 2016, after talking to Noyes about obtaining drugs, Morris and Durden discussed robbing Noyes's source.  Morris and Durden observed that the source probably had more than drugs—"we can go in his pockets." They talked again that night about robbing the source, as "[t]hat's easy money there."  They weren't worried about Noyes's reaction.

Morris and Durden planned at least two other robberies, both of which were thwarted by police.  One of these attempted robberies occurred on August 8, 2016, after Raphiel Wilson informed Morris that there was someone in a Walmart parking lot with $17,000.  Police, who were listening to the Block Boyz's calls as part of an ongoing investigation, went to the Walmart.  Wilson and Morris's target eventually left the Walmart parking lot and headed for an apartment complex; Wilson and Morris followed.  Wilson's car was pulled over by police before reaching the complex, though the police eventually let him go. Morris was apprehended at the complex in an Impala; Durden was also in the car.  In the backseat passenger floorboard area was a semiautomatic gun with an extended magazine.  Officers found four more guns in the trunk of the car. Morris and Durden were arrested.

About two weeks later, Durden spoke to Davenport from jail.  Davenport was aware that the Block Boyz were under investigation and was concerned about government informants working from inside the jail.  She told Durden that some "Baby daddy" was a "damn apple" and "wasn't no good."  Singling

out an unidentified female associated with the "bad apple," Davenport warned, "[t]hat girl signed a separation" "on your people" and "that's why my people got put[] in foxtrot." Durden seemed to understand that Davenport was "saying . . . he"—the "bad apple" in the jail—"don't need to be around me." The next day, however, Durden called Davenport for clarification. Durden specifically asked if he needed to "whoop his a[**] or something," referring again to the suspected informant. Davenport elaborated that the person in question was "foul" and that the girl he associated with was "running" "with the badge." Durden then informed Davenport that the man in question was his cellmate, and that the girl they spoke of had been coming to see him every day. He told Davenport that "I'm gonna whoop his a[**]" and to "tell [Morris] I don't know what them people fixing to do with me I'm fixing to whoop that boy[']s a[**] though." Davenport told Durden that she loved him and to be careful. Later that day, Durden "swung on" his cell mate, Jimmy Jenkins.

Based on the foregoing evidence, the government filed an eighteen-count indictment. After a two-and-a-half-week jury trial, the defendants were found guilty on all tried counts. Johnson, Morris, Durden, McCain, and Davenport were convicted of conspiracy to participate in the affairs of a racketeering enterprise in violation of 18 U.S.C. § 1962(d) (Count 1); Morris, Durden, McCain, and Davenport were convicted of conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 2); Morris was convicted of distributing crack cocaine in violation of 21 U.S.C. § 841(a)(1) (Counts 9–11); Durden, McCain, and Morris were convicted of possessing a firearm while a felon in violation of 18 U.S.C. § 922(g) (Count 8: McCain; Count 12: Morris; Count 15: Durden and Morris); and Davenport was convicted of distributing powder cocaine, in violation of 21 U.S.C. § 841(a)(1) (Counts 16–18). Before the case was submitted to the jury, Johnson, McCain, and Durden challenged the sufficiency of the evidence supporting their racketeering-

conspiracy convictions. Durden additionally challenged the sufficiency of the evidence supporting his controlled-substance-conspiracy and felon-in-possession convictions. And Morris challenged the evidence supporting his crack-distribution convictions. The district court rejected all challenges. Ultimately, it sentenced defendants to the following prison terms: Johnson, 240 months; Morris, 405 months; Durden, 190 months; McCain, 110 months; and Davenport, 71 months.

## DISCUSSION

Defendants raise a myriad of claims requiring the application of different legal standards. We consider each claim in turn.

### I. Sufficiency of the Evidence[4]

The defendants begin by renewing their sufficiency of the evidence objections. Specifically, Johnson, McCain, and Durden challenge the sufficiency of the evidence supporting their racketeering-conspiracy convictions. Durden additionally challenges the evidence supporting his controlled-substances-conspiracy and felon-in-possession convictions. And Morris challenges the evidence supporting his crack-distribution convictions.

"This court reviews preserved challenges to the sufficiency of the evidence de novo." *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012). "The ultimate test for sufficiency of the evidence challenges is whether a reasonable jury could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Salazar*, 958 F.2d 1285, 1291 (5th Cir. 1992). "When reviewing the sufficiency of the evidence, we view all evidence,

---

[4] Defendants have, for the most part, filed briefs that adopt the arguments advanced by their co-defendants. *See* FED. R. APP. P. 28(i). Because we reject all defendants' challenges, we do not note which defendants have adopted which arguments. *See generally United States v. Alix*, 86 F.3d 429, 434 n.2 (5th Cir. 1996) ("[A]n appellant may not raise fact-specific challenges to his own conviction or sentence . . . by merely referring to similar challenges in another appellant's brief.").

No. 19-30619

whether circumstantial or direct, in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in support of the jury's verdict." *United States v. Ford*, 558 F.3d 371, 375 (5th Cir. 2009). "The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt, so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *Id.*

## A. Racketeering Conspiracy Convictions

The Racketeer Influenced and Corrupt Organizations Act ("RICO") makes it a crime "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," 18 U.S.C. § 1962(c), or to conspire to do so, *id.* § 1962(d). The statute defines "racketeering activity" as acts "indictable" or "chargeable" under various federal and state laws, including murder, robbery, and drug distribution. *Id.* § 1961(1). A "pattern of racketeering activity" requires "at least two acts of racketeering activity" occurring within a ten-year period. *Id.* § 1961(5). An "enterprise" is defined to include any "group of individuals associated in fact although not a legal entity." *Id.* § 1961(4). The concept is "expansive," but it "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 944–46, 129 S. Ct. 2237, 2243–44 (2009).

"To prove a RICO conspiracy the government must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998). "The

agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the 'development and collocation of circumstances.'" *Id.* (quoting *United States v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992)). No predicate offense need actually be committed, *Salinas v. United States*, 522 U.S. 52, 63–64, 118 S. Ct. 469, 476–77 (1997); nor does the indicted conspirator need to have agreed to commit specific predicate acts. *United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005). Rather, it is sufficient that the conspirator "kn[ew] of and agreed to the overall objective of the RICO offense." *Id.*

The evidence clearly establishes that the Block Boyz were a criminal enterprise with the purpose of obtaining money by selling drugs and "hitting . . . lick[s]"—or "taking things without paying." As one member of the Block Boyz described it, the group's purpose was "drugs and territory." Members defended and protected each other from rival gangs. And they advertised their affiliation with each other by wearing red, getting tattoos, and posting about the Block Boyz on social media. The Block Boyz's criminal activities lasted for years; members were fighting and shooting rival gangs, specifically the Trap Boyz, as early as May 2012 and continued to fight the Trap Boyz until August 2016. Jail time, injuries, and even death did not disrupt their mission. Hammer was killed and Johnson was shot during the January 2014 robberies, and Frank was arrested in July 2016, but Morris, Davenport, and others kept selling drugs and planning robberies.

Johnson contends that the Block Boyz was just "a group of young teenagers who got together to have fun and play rap music."[5] That may have

---

[5] In a related vein, some of the defendants contend that they were simply connected by blood and friendship, not by involvement or association with the Block Boyz. The two relationships, however, are not mutually exclusive, and the evidence belies this contention.

11

been how the Block Boyz started. But their purpose quickly became criminal. The jury heard ample evidence demonstrating as much.

Relatedly, it heard overwhelming evidence establishing that the Block Boyz engaged in a pattern of racketeering activity. Although the government was only required to establish that the defendants conspired to commit the predicate acts undergirding the RICO conspiracy indictment, *see* 18 U.S.C. § 1962(d), the jury heard evidence that the Block Boyz actually committed many predicate offenses, including attempted murder, attempted robbery, robbery, and drug distribution. Johnson argues that this evidence was insufficient to support his conviction because the government did not prove that he engaged in specific predicate offenses with a nexus to the Block Boyz enterprise. Again, however, the government need only establish that Johnson knew of and agreed to the overall objective of the conspiracy. *See Delgado*, 401 F.3d at 296. The government did that and then some; it presented evidence that Johnson committed attempted murder, robbery, and attempted robbery in connection with the Block Boyz.

For example, the government established that Johnson participated in the two January 2014 robberies. Johnson does not dispute that. But he asserts the robberies were not Block Boyz related activities because the leader of the robberies, Hammer, was not a member of the gang. Accepting, for present purposes, that Hammer was not a member of the Block Boyz, Johnson's claim is still without merit. This court has held that the racketeering statute "applies to outsiders as well as to insiders." *United States v. Welch*, 656 F.2d 1039, 1065 (5th Cir. 1981). Put differently, an outsider's involvement in a predicate act does not necessarily render the act outside the scope of the enterprise. Additionally, it is not clear that Hammer led the January 2014 robberies. Morris, the Block Boyz's leader, was with Hammer before the first robbery; spoke to Hammer on the phone right after that robbery, telling him

where to go next; and participated in the second robbery.  The jury could thus reasonably infer that Morris, not Hammer, directed the group's actions.  *But cf. United States v. Jones*, 873 F.3d 482, 493 (5th Cir. 2017) (determining that the evidence presented at trial was insufficient to connect a shooting to the shooter's membership in a criminal enterprise or the charged conspiracy).

Johnson also argues that "two home invasions on the same day does not show a pattern of racketeering activity."  This argument fails for at least two reasons.  First, Johnson need not have committed any predicate offense.  It is enough that two people agreed to violate Section 1926(c) and that Johnson "agreed to the overall objective of the conspiracy."  *Delgado*, 401 F.3d at 296.  The jury could find the conspiratorial agreement from the Block Boyz's many actual and planned criminal acts, including the drug dealing and shootings in which Johnson participated.  Second, the two robberies constitute separate offenses.  Although they occurred on the same night, the robberies were not a single criminal transaction—they involved different accomplices, different victims at different locations, and a break in-between.  *Cf. United States v. Washington*, 898 F.2d 439, 442 (5th Cir. 1990) (determining, for purposes of sentencing, that two robberies arose out of separate courses of conduct despite the robberies being committed within a  few hours of each other against the same victim and at the same location).  Johnson's contrary argument is unavailing.

Like Johnson, McCain argues that the evidence was insufficient to support his RICO-conspiracy conviction.  He notes that he was not named in most of the overt acts in the indictment and that the jury did not find that he personally participated in any robberies or attempted murders in connection with the racketeering enterprise.  That is true, but it does not get McCain off the hook.  He was involved with the Block Boyz and understood the gang's objectives—to make money by selling drugs and committing armed robberies,

No. 19-30619

and to fight rival gangs. Abundant evidence establishes that McCain joined the Block Boyz to further this objective. He helped sell drugs, obtain guns, and fight the rival Trap Boyz.

McCain acknowledges that he helped the Block Boyz acquire guns. But he argues that it was legal for him do so, or at least legal to discuss obtaining firearms. Accepting that proposition as true, a legal act may nonetheless further an illegal conspiracy. *See United States v. Girard*, 744 F.2d 1170, 1174 (5th Cir. 1984). And the evidence establishes that McCain discussed, possessed, and used guns in furtherance of the Block Boyz's illegal drug distribution and in fights with rival gangs.

Durden raises many of the same arguments as Johnson and McCain. He principally contends that he never agreed to "a course of action that would involve the commission of two substantive crimes." The evidence presented at trial makes short work of this assertion. Durden discussed drug deals on recorded calls, discussed robbing drug sources with Morris, Morris arranged for Durden to make drug sales, and Durden helped Morris hide evidence of drug distribution from the police, moving guns, ammunition, and gallon bags containing residue from Davenport's home to the Midway house.[6]

Durden, moreover, participated in the August 8, 2016, attempted robbery. Officers observed Durden, Morris, and Wilson follow their mark to an apartment complex; they heard Morris and Wilson discuss the attempted robbery while Durden was presumably in the car; and they arrested Durden

---

[6] Durden presents several novel, unsupported theories to rebut this condemning evidence. He admits that Morris sent text messages to his phone arranging a drug transaction. But he contends that no evidence establishes he was actually the person receiving those texts, and that someone else was in possession of his phone at the time. He also suggests that phone calls between him and Morris concerning potential drug transactions do not reveal that he was working with Morris; Morris was just seeking his "advice." A "reasonable trier of fact," however, could readily conclude otherwise. *Ford*, 558 F.3d at 375.

14

and Morris with five loaded guns in their car.  Durden claims he played no role in the attempted robbery.  But, based on the foregoing evidence, the jury could infer otherwise.

## B. Drug Conspiracy Conviction

Durden separately challenges his drug-conspiracy conviction.  To find Durden guilty on this count, the jury had to find that there was an agreement between two or more people to violate controlled-substance laws, that Durden knew of the agreement, and that he voluntarily joined it.  *United States v. Inocencio,* 40 F.3d 716, 725 (5th Cir. 1994).  As previously noted, overwhelming evidence establishes that a primary purpose of the Block Boyz was selling drugs.  The jury was free to infer that that Durden voluntarily joined the Block Boyz knowing this purpose.  He discussed drug deals with Morris on the phone and was instructed by Morris to complete a drug sale.  Durden also helped Morris hide drug-distribution evidence from police.  This evidence is fatal to Durden's sufficiency challenge.

## C. Drug Distribution Convictions

Counts 9, 10, and 11 indicted Morris with distributing crack in connection with three controlled buys with Q.T., a government informant.  Morris contests the sufficiency of the evidence supporting these convictions.  He concedes that he participated in controlled-substance transactions.  And he acknowledges that, for a fee, he cooked powder cocaine into crack, then gave it to Q.T.  He argues, however, that the evidence shows only that he was a middleman in a drug transaction for powder cocaine, not crack, then subsequently cooked the powder into crack.  Such conduct, he contends, does not constitute "distribution of crack."

Morris impermissibly narrows the definition of "distribute" to serve his cause.  The Controlled Substances Act defines "distribute" as "to deliver . . . a controlled substance" and defines "deliver" and "delivery" as "the actual,

constructive, or attempted transfer of a controlled substance." 21 U.S.C. § 802(8), (11). "The term distribute is broader in scope than the term sale, and means to deliver, other than by administering or dispensing." *United States v. Ambriz*, 727 F.3d 378, 383 n.6 (5th Cir. 2013) (quoting Fifth Circuit Pattern Jury Instructions (Criminal) No. 2.87 (2012)). In light of these definitions, there can be little dispute that Morris delivered crack to Q.T. on the charged dates. Morris "actual[ly] . . . transfer[red]," 21 U.S.C. § 802(8), crack to Q.T. when he cooked powder cocaine into crack for a fee and then handed the crack to Q.T.

Moreover, the evidence established that Morris sold, and not merely distributed, crack to Q.T. Morris knew that Q.T. wanted to buy crack, not powder cocaine. Before the May 31 transaction at issue in Count 9, Q.T. had bought crack from Morris. Q.T. asked Morris, before paying him, if he could receive the cocaine in crack form, and they agreed on a price that included a cooking fee before any money changed hands. Likewise, for both the June 8 and June 22 transactions, Q.T. asked Morris to provide the cocaine in crack form before any money was exchanged. Q.T. also specifically requested that Morris be the seller. And when questioned on cross-examination, Q.T. stated that he paid Morris, not the individual who brought cocaine to Morris, and that Morris gave him the drugs, not the third party. The evidence thus establishes that Morris distributed crack to Q.T.

### D. Felon-in-Possession-of-a-Firearm Conviction

The final sufficiency challenge comes from Durden and is directed at his felon-in-possession-of-a-firearm conviction. To secure a conviction on this charge, the government was required to show that that Durden was previously convicted of a felony and was aware of his felon status, that he possessed a firearm (actually or constructively), and that the firearm traveled in or affected interstate commerce. *See Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019);

*United States v. Guidry*, 406 F.3d 314, 318 (5th Cir. 2005).  Durden does not dispute that he was previously convicted of a felony and that he knew as much; nor does he dispute the interstate commerce element.  He argues only that the evidence was insufficient to establish that he knew about, and therefore actually or constructively possessed, the loaded guns found in Morris's car after the attempted robbery on August 8, 2016.  The jury, however, could infer from the evidence that Durden and Morris together possessed the five loaded weapons in Morris's car.

Just weeks before the August 8 attempted robbery, Durden and Morris discussed other robbery plans and plans to hide ammunition from the police.  Durden and Morris also discussed obtaining guns less than a week before the August 8 robbery.  And Durden asked Morris on the afternoon of the robbery, "Whatcha want me to do with your gun?"  One of the police officers who arrested Morris testified that Durden, when confronted, tried to reach into the backseat where one of the guns was found.  The jury also heard one of Durden's co-conspirators tell Raphiel Wilson and Davenport that Durden and Morris had been caught with guns in the car.  The jury could infer that Durden had at least the same level of knowledge as his co-conspirator, and could further infer that Durden either actually or constructively possessed a firearm.

## II. Vagueness Challenges to the Racketeering Statute

McCain and Morris argue that the RICO statute is unconstitutionally vague both facially and as applied.  Their facial challenge is foreclosed by circuit precedent, and their as-applied challenge fails under plain error review.

Although we typically review the constitutionality of a federal statute de novo, *United States v. Martinez-Mata*, 393 F.3d 625, 627–28 (5th Cir. 2004), an unpreserved challenge is reviewed for plain error, requiring the defendant to demonstrate error that is clear or obvious and that affected his substantial rights.  *United States v. Anderton*, 901 F.3d 278, 282–83 (5th Cir. 2018).  Even

then, we have discretion to correct such errors only when they seriously affect the fairness, integrity, or public reputation of judicial proceedings. *See id.*

Morris and McCain contend that the racketeering statute is unconstitutionally vague—both on its face and as applied to them—because "[t]erms such as 'associated with,' 'enterprise,' 'conduct,' 'participate,' 'indirectly,' 'affairs,' and 'pattern of racketeering activity' provide no guidance as to what conduct the statute prohibits." They rely principally on Justice Scalia's concurrence in *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S. Ct. 2893 (1989).[7] However, this court long ago considered and rejected a facial challenge to the RICO statute premised on Justice Scalia's *H.J.* concurrence. *See Abell v. Potomac Ins. Co. of Ill.*, 946 F.2d 1160, 1164–67 & n.14 (5th Cir. 1991) (discussing the *H.J.* concurrence and collecting cases rejecting vagueness challenges predicated on it); *see also United States v. Krout*, 66 F.3d 1420, 1432 (5th Cir. 1995) ("This circuit has already specifically rejected the facial challenge to the vagueness of 'pattern of racketeering activity.'"). We recognize that today's Supreme Court is not shy about employing the vagueness doctrine to second-guess otherwise valid legislative judgements. *See, e.g.*, *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018); *Johnson v. United States*, 576 U.S. 591, 135 S. Ct. 2551 (2015). But our precedents remain on the books, as does the Supreme Court's rejection of a vagueness challenge to a state RICO statute strikingly similar to the federal RICO statute. *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 58, 109 S. Ct. 916, 925 (1989) ("We

---

[7] Justice Scalia's concurrence targeted the Court's definition of "the enigmatic term 'pattern of racketeering activity.'" *H.J.*, 492 U.S. at 251, 109 S. Ct. at 2906 (Scalia, J., concurring). He did not discuss the other terms Morris claims are vague, including "conduct," "participate," and "enterprise"; nor does Morris explain how those terms are vague other than offering the conclusory allegation that they give "judges and law enforcement officials" "unlimited discretion." Because Morris did not adequately brief his broader statutory challenge, the argument is waived. *United States v. Whitfield*, 590 F.3d 325, 346 (5th Cir. 2009).

find no merit in petitioner's claim that the Indiana RICO law is unconstitutionally vague as applied to obscenity predicate offenses. Given that the RICO statute totally encompasses the obscenity law, if the latter is not unconstitutionally vague, the former cannot be vague either."). These realities, coupled with the defendants' failure to cite a single decision supporting their position, dooms the defendants' facial challenge.

Similarly, the defendants fail to cite a single case where RICO was found to be unconstitutionally vague as applied to any defendant under any set of circumstances. The lack of legal authority makes it difficult, if not impossible, for the defendants to establish plain error. *See Anderton*, 901 F.3d at 283.

Irrespective of that, the defendants' claim fails on its merits. To successfully mount an as-applied vagueness challenge to the RICO statute, a defendant must "show this [c]ourt that the scope of [the] 'pattern' [(or other)] element [i]s so unclear that a person of ordinary intelligence in [the defendant's] position would not have had adequate notice that his actions constituted a" RICO offense. *Abell*, 946 F.2d at 1167. The defendants' superficial arguments come nowhere close to making this showing. The defendants joined a gang whose express purpose was to "get your money" by illegal means. And the evidence established that Morris and McCain (and their co-defendants) engaged in numerous illegal acts over several years. They thus cannot reasonably argue that a person in their position would not have known that the Block Boyz was a criminal enterprise engaged in a pattern of racketeering activity.

### III. Plain-Error Challenge to the Racketeering Conspiracy Indictment

Durden alleges that the indictment for the racketeering conspiracy was insufficient. He failed to preserve this challenge. We thus review the

indictment's sufficiency for plain error. *United States v. Hoover*, 467 F.3d 496, 498 (5th Cir. 2006).

"To pass constitutional muster, an indictment must allege every element of the crime charged and in such a way as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding." *United States v. Pratt*, 728 F.3d 463, 477 (5th Cir. 2013), *abrogated on other grounds by Molina-Martinez v. United States*, 136 S. Ct. 1338, 1347–48 (2016) (alteration removed) (internal quotation marks and citation omitted). An indictment is sufficient if it describes the offense using "the words of the statute itself" "accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense." *Id.* (internal quotation marks and citation omitted). A racketeering indictment, in particular, "need not contain formal charges of the underlying racketeering activities or articulate the evidence that will be used to prove the allegations." *Id.* at 478.

The count in the indictment Durden challenges, Count 1, spans fifteen pages and includes the statutory language, identifies the Block Boyz as the criminal enterprise, establishes the time period during which the Block Boyz operated, names Durden's co-conspirators, and lists the numerous state and federal violations that constituted predicate offenses along with the co-conspirator who performed each act and the date it was performed. Durden nonetheless maintains this is insufficient. He argues that the indictment must pinpoint when each specific defendant joined the conspiracy and provide a "way of determining what activities conducted were part of the [conspiracy's] agreement." This court has not required that a RICO indictment include such specificity; nor does the Constitution. Instead, case law "requires only enough specificity to allow the defendant to defend against the allegations." *Pratt*, 728 F.3d at 478 & n.56. The indictment here easily clears that bar. It stated

when the conspiracy started and ended, and it identified numerous overt acts committed by Durden and others. *Cf. id.* We refuse to adopt Durden's offbeat position.

## IV. Plain-Error Challenge to the Drug Conspiracy Indictment

It is unclear whether Morris argues that the drug-conspiracy statute is unconstitutionally vague or that the indictment was insufficiently specific. He initially cites the standard of review for a constitutional challenge to a statute. But the remainder of his argument section targets the indictment. Regardless how his challenge is construed, it fails.

Morris never explains why the drug-conspiracy statute is unconstitutionally vague and has thus waived this argument. *See Whitfield*, 590 F.3d at 346. But even if he had briefed it, we would reject it; Section 846 is not unconstitutionally vague. *See United States v. Cooper*, 606 F.2d 96, 98 (5th Cir. 1979) (per curiam).

As for Morris's challenge to the indictment, this court has held that an indictment charging a violation of 21 U.S.C. § 846 is sufficient if it uses the words of the statute, names the statute, and specifies the conspiracy's duration. *United States v. Khan*, 728 F.2d 676, 681 (5th Cir. 1984). These requirements were met here. Morris contends, however, that the indictment did not identify which racketeering overt acts were in furtherance of the Section 846 drug-distribution conspiracy. But an indictment need not allege any overt act to sufficiently state a Section 846 conspiracy. *Id.*; *see also United States v. Gaytan*, 74 F.3d 545, 552 (5th Cir. 1996) ("Nor is it fatal that the indictment failed to identify specific criminal acts constituting the alleged conspiracy."). We see no error in the indictment, let alone one that is plain or obvious.

No. 19-30619

## V. Admitting Evidence of Johnson's 2012 Shooting

Before trial, Johnson moved to exclude mention of his May 2012 shooting. The district court denied the motion, finding that the evidence was intertwined with the charged conduct and that its probative value was not substantially outweighed by the danger of unfair prejudice. The court also rejected Johnson's argument that the evidence was inadmissible because he was seventeen at the time of the shooting. Johnson conceded that he was an adult under state law at the time and "concede[d] there is no authority which would preclude the use of this conviction based upon Johnson's age at the time of the shooting." Johnson renewed the objection at trial, and the district court again denied it.

He raises the same arguments on appeal, contending first that evidence of the May 2012 shooting was inadmissible under Rule 404(b). The evidence, however, was not admitted under that rule;[8] as the district court explained, the shooting was intertwined with the charged RICO offense, and the jury was free to infer that the shooting constituted a predicate racketeering act. Johnson observes that the 2012 shooting was not expressly listed as an overt act or predicate act in the indictment. But the evidence presented at trial need not be limited to overt or predicate acts expressly listed in the indictment, so long as the defendant has adequate notice. *See United States v. Carlock*, 806 F.2d 535, 550 (5th Cir. 1986). Here, Johnson had ample notice that the government intended to introduce evidence of the shooting, which occurred within the relevant period alleged in the indictment, as evidence intrinsic to

---

[8] To be sure, the government moved to allow the introduction of the May 2012 shooting pursuant to Rule 404(b). But it did so out of an abundance of caution, maintaining that the shooting was "intrinsic to the charged conduct." At a later hearing, the government asserted that the shooting "occurred during the time period of the conspiracy" and should be considered "a predicate racketeering act." The district court agreed, concluding that the May 2012 shooting was not "extrinsic evidence under [Rule] 404(b)."

the charged conduct.  We therefore consider Johnson's challenge under the deferential standard we apply to Rule 403 rulings.  *United States v. Clark*, 577 F.3d 273, 287 (5th Cir. 2009) ("In reviewing Rule 403 findings, we give great deference to the [trial] court's informed judgment and will reverse only after a clear showing of prejudicial abuse of discretion.") (alteration in original) (internal quotation marks and citation omitted).

This standard suggests no reason to reverse.  The probative value of the evidence is obvious:  The jury could use it to infer the commission of a predicate racketeering act.  And the potential for unfair prejudice was relatively low where, as here, Johnson's shooting in 2012 was no more violent than his involvement in the Kings Manor and Briarwood robberies, the latter of which resulted in several injuries and a death.

Johnson also argues that the district court should not have admitted evidence of the May 2012 shooting because he was seventeen years old at the time and thus a juvenile for purposes of federal prosecution.  This argument fails for at least two reasons.  First, the Juvenile Delinquency Act does not apply to defendants like Johnson who are over twenty-one when indicted. *United States v. Guerrero*, 768 F.3d 351, 361 (5th Cir. 2014) (citing 18 U.S.C. § 5031).  Second, the Act applies only to an "act of juvenile delinquency," defined as a crime "committed by a person prior to his eighteenth birthday." 18 U.S.C. § 5031.  The May 2012 shooting relates to the crime of racketeering conspiracy.  Because Johnson "ratified his involvement in the conspiracy" after he turned eighteen in July 2012, his participation in the conspiracy (including the May 2012 shooting) was not an act of juvenile delinquency.  *Guerrero*, 768 F.3d at 362 (citation omitted); *see also id.* ("Ratification in this context simply means that a defendant 'continu[es] to participate in an ongoing conspiracy after his 18th birthday.'") (alteration in original) (quoting *United*

*States v. Peters*, 283 F.3d 300, 309 (5th Cir.2002)).  The district court did not err in allowing evidence of the May 2012 shooting to go before the jury.

## VI. Challenge to the Verdict Form and Jury Instructions

Durden, McCain, Morris, and Johnson challenge the RICO conspiracy verdict form, arguing it should have required the jury to identify the date or location of specific predicate offenses.[9]  Without such specificity, they argue, it is impossible to assert sufficiency of the evidence claims.[10]  This is a novel, legally unsupported argument.  To the contrary, with an appropriate unanimity instruction, this court has allowed even general verdict forms.  *E.g.*, *United States v. Thompson*, 253 F.3d 700, 2001 WL 498430, at \*10 (5th Cir. 2001) (unpublished) (citing *United States v. Shenberg*, 89 F.3d 1461, 1472 (11th Cir. 1996)).

Here, the court provided more than just an unanimity instruction.  It first informed the jury that it must find that each "defendant agreed that a conspirator would engage in a pattern of racketeering activity."  The district court correctly defined "[a] pattern of racketeering activity," to "require[] at least two acts of racketeering," and instructed the jury that its "verdict must be unanimous as to which specific racketeering acts you find the defendant agreed would be committed."  The verdict form asked the jury to identify the type of predicate act for each defendant before reinforcing the unanimity requirement, specifying that the jury was required to unanimously agree on "at least two acts" and to the "specific event" involved.  The district court

---

[9] Because defense counsel objected to the exclusion of more specific information on the verdict form, our review is for abuse of discretion.  *United States v. Piper*, 912 F.3d 847, 853 (5th Cir. 2019).

[10] Durden's own briefing, which analyzes each of the racketeering acts that the jury could have possibly attributed to him, undermines this contention.  The other defendants do not even attempt such analyses.

observed that the defendants' date-and-location request would be too onerous for the jury and risked requiring the court to comment on the evidence by, for example, stating that a particular defendant may have committed multiple predicate offenses on a single day. Additionally, to alleviate any concern that defendants might be convicted based on a single act, the court instructed the jury, in the verdict form, that if a defendant committed a particular crime more than once, the jury must agree as to the specific events that constituted a racketeering act. We "presume[] that juries follow the instructions the court gives them." *United States v. Owen*, 683 F.3d 93, 99 (5th Cir. 2012). Defendants supply no reason to second-guess that presumption here. The thorough instruction provided by the district court coupled with the wide discretion trial courts are granted to fashion verdict forms compel the conclusion that the district court did not abuse its discretion.[11]

McCain additionally argues, for the first time on appeal, that the jury instructions were plainly erroneous because they failed to state "that two acts of racketeering do not necessarily constitute a pattern of racketeering activity." But the unobjected-to jury instruction accurately states this court's long-held definition of a pattern of racketeering activity. *See United States v. Brown*, 555 F.2d 407, 416 (5th Cir. 1977). McCain cites no authority supporting his position, and our model jury instructions directly rebut it. *See* Fifth Circuit Pattern Jury Instructions (Criminal) No. 2.79 (2019). The lack of contrary authority is fatal to McCain's plain-error claim. *Anderton*, 901 F.3d at 283.

---

[11] Contesting this conclusion, Durden directs the court to *United States v. Cain*, 671 F.3d 271, 291 (2d Cir 2012). But that decision did not find error in the verdict form. Instead, after finding instructional error, the Second Circuit could not determine whether it was harmless "[b]ecause the verdict form . . . did not require the jury to identify the specific predicate acts that supported its verdict." *Id.* No similar instructional error infected the proceedings here.

## VII. Racketeering Convictions and Double Jeopardy

Durden argues, for the first time on appeal, that his convictions for racketeering and drug-distribution conspiracy violate the Double Jeopardy Clause. This argument is foreclosed by circuit precedent.

The Double Jeopardy Clause, "at its core[,] prevents a defendant from being tried more than once for a single offense." *United States v. Vasquez*, 899 F.3d 363, 381 (5th Cir. 2018). But it "does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S. Ct. 673, 678 (1983). This court long ago determined that "Congress intended RICO conspiracy to be a separate offense from the predicate act of a [controlled-substance] conspiracy." *United States v. Deshaw*, 974 F.2d 667, 672 (5th Cir. 1992). As the court (correctly) explained in *Deshaw*, the racketeering "statutory language reflects congressional intent to supplement, rather than supplant, existing crimes and penalties." *Id.* at 671–72. RICO and the statutes undergirding a RICO indictment—in Durden's case Section 846—"are intended to deter two different kinds of activity." *Id.* at 672. And "each provision"—Section 1962(d), prohibiting racketeering conspiracies, and Section 846, prohibiting controlled-substance conspiracies—"is unambiguous and authorizes punishment for a violation of its terms." *Id.* Thus, "an indictment charging RICO predicates as separate offenses is not multiplicitous." *United States v. Cauble*, 706 F.2d 1322, 1351 (5th Cir. 1983). Durden fails to cite a single case countering this broad swath of authority. We accordingly reject his double jeopardy challenge.

## VIII. Sentencing and Double Jeopardy

Morris raises a separate double jeopardy concern. He argues that the district court's grouping of racketeering predicates under the sentencing guidelines violated his double-jeopardy rights. Morris is mistaken. To understand why, we first explain the rulings under review.

Morris's Presentence Report ("PSR") grouped his racketeering, controlled-substance, and felon-in-possession convictions pursuant to U.S.S.G. § 3D1.2. For racketeering convictions, the base offense level is the greater of 19 or the base offense level for the underlying racketeering activity. U.S.S.G. § 2E1.1(a). Where there is more than one underlying offense, each is treated as a separate conviction and grouped under Chapter 3, Part D. *Id.* at cmt. n.1. Morris's racketeering conviction involved several controlled-substances offenses, two attempted robberies (January 2014 and August 2016), and several felon-in-possession offenses. Under U.S.S.G. § 3D1.2, the controlled-substances offenses constituted one group and each attempted robbery constituted its own group. The felon-in-possession convictions were included as offense characteristics for the drug distribution group.

For Group 1 (the controlled-substance convictions), the PSR calculated a total offense level of 34. For Group 2 (the January 28, 2014, attempted robbery), the PSR calculated a total offense level of 33. And for Group 3 (the August 8, 2016, attempted robbery), the PSR calculated a total offense level of 29. The PSR then assigned each offense group units under U.S.S.G. § 3D1.4(a) and (b). Because Groups 1 and 2 were within one level of each other, each received one unit. Group 3, which was five levels less than Group 1, received a half unit. Pursuant to U.S.S.G. § 3D1.4, two-and-a-half units results in a three-level increase to the highest offense level. Thus, Morris's offense level became 37. With a criminal history category of V, Morris's advisory guidelines range was 324 to 405 months' imprisonment, subject to certain statutory maxima.

At sentencing, Morris contended that it violates the Double Jeopardy Clause to be punished for both attempted robberies when those were technically part of the racketeering count. The district court overruled Morris's objection, noting that the jury had found that Morris engaged in more than one

attempted robbery and that "the calculation of a sentence under the guidelines and the legal requirements for a conviction under RICO are separate matters that the [c]ourt considers separately." The district court then sentenced Morris to 240 months' imprisonment as to Counts 1 (RICO), 2 (conspiracy to distribute controlled substances), 10 (distribution of crack cocaine), and 11 (distribution of crack cocaine); 405 months' imprisonment as to Count 9 (distribution of 28 or more grams of crack cocaine); and 120 months' imprisonment as to Counts 12 and 15 (felon in possession of a firearm), with all sentences to run concurrently.

Morris renews his double jeopardy argument on appeal. Because he was only convicted of one racketeering count, he argues that the district court could not consider racketeering predicates for three separate sentencing groups. Morris is mistaken. The district court did exactly what the sentencing guidelines require. *See* U.S.S.G. § 2E1.1; *see also Pratt*, 728 F.3d at 479–80 (explaining how to apply U.S.S.G. § 2E1.1). More to the point, Morris has not shown that he was punished twice for the racketeering conspiracy. He received a single sentence of 240 months' imprisonment, the statutory maximum. Morris's objection to the PSR's grouping did not affect that sentence. With an initial offense level of 34, his guidelines range would have been 235 to 240 months for Count 1, and he was sentenced within that range. While true that his sentence for one of the drug-distribution convictions, Count 9, was higher than it would have been had the district court considered just the Group 1 offenses (i.e., excluded the attempted robberies), the Supreme Court has established that the "use of evidence of related criminal conduct to enhance a defendant's sentence for a separate crime within the authorized statutory limits does not constitute punishment for that conduct." *Witte v. United States*, 515 U.S. 389, 399, 115 S. Ct. 2199, 2206 (1995). Morris received sentences

within the statutory ranges for his drug-distribution and racketeering convictions. Thus, there is no double jeopardy problem.

## IX. Substantive Reasonableness of Durden's Above-Guidelines Sentence

Durden avers that the district court erred by sentencing him above the guidelines range. Durden's PSR calculated his advisory guidelines range as 130 to 162 months' imprisonment. The district court acknowledged this range, but imposed an above-guidelines sentence of 190 months, finding that the guidelines' sentencing range "does not adequately reflect the seriousness of the instant offenses, nor Mr. Durden's involvement in the RICO conspiracy, as well as . . . the harm inflicted on his community, both actual and potential."

We review the substantive reasonableness of the district court's sentence for an abuse of discretion. *United States v. Robinson*, 741 F.3d 588, 598 (5th Cir. 2014). Where a district court varies upward from the applicable guideline range, this court "give[s] due deference to the district court's decision that the [Section] 3553(a) factors, on a whole, justify the extent of the variance." *Gall v. United States*, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007). We reverse if the sentence "unreasonably fails to reflect the statutory sentencing factors" by "(1) . . . not account[ing] for a factor that should have received significant weight, (2) giv[ing] significant weight to an irrelevant or improper factor, or (3) represent[ing] a clear error of judgment in balancing the sentencing factors." *United States v. Smith*, 440 F.3d 704, 708 (5th Cir. 2006).

Durden's principal argument is that his sentence is unreasonable because a co-defendant, Alford, received a shorter sentence despite being named in one more overt act in the indictment. Alford, however, had a lower sentencing guidelines range than Durden. And Durden had a more extensive criminal history than Alford. Durden's sentence was 28 months above the guidelines range while Alford's was 55 months above the guidelines range.

Durden notes that Alford was accused of discharging a firearm in a residence, conduct Durden suggests indicates severe culpability.   But Durden was implicated in no less violent conduct, having been involved in two shootings.

The district court noted that Durden's guidelines range did not account for the extent of his drug dealing or "the violent nature of [his] crimes," which "show[ed] a reckless disregard for human life."  The district court specifically observed that Durden "even beat up someone after he had been incarcerated." Moreover, while one of Durden's attempted murders was included in his criminal history category, it was not included in "the calculation of the offense level."  For all these reasons,  the court found that a guidelines sentence would not "protect the community" and allow it "to have faith and confidence in the criminal justice system."  We see no error in that determination.  Durden's sentence reflects the statutory sentencing factors, as our law requires, and does not give significant weight to any irrelevant factor.

## X. Obstruction-of-Justice Enhancement

The last contention we review is Davenport's argument that the district court plainly erred when imposing a two-level guidelines enhancement for obstruction of justice.   The sentencing guidelines provide for a two-level enhancement if a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" (or a closely related offense).  U.S.S.G. § 3C1.1.  The commentary provides a "non-exhaustive list" of covered conduct, including "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so."  U.S.S.G. § 3C1.1, cmt. n.4(A).

Here, the district court determined that Davenport influenced Durden to threaten or intimidate a witness when she told Durden that Jenkins, Durden's cellmate, was a "bad apple"—an informant.  Durden told Davenport that he

intended to "whoop [Jenkins's] a[**]." Davenport, though not specifically encouraging that conduct, told Durden to be careful and that she loved him. Later that day, Durden attacked Jenkins.

Davenport avers that she did not know that Jenkins was in jail with Durden, and thus she could not have intended that Durden assault him. The district court could reasonably infer otherwise. In their August 17 call, Davenport told Durden that Jenkins's girlfriend "signed a separation"—a request to be placed in a different prison housing unit—and "that's why my people got put[] in foxtrot." Davenport also told Durden that the "apple don't need to be around y'all." The next day, Davenport told Durden that Jenkins's girlfriend had been to visit him, and he revealed that Jenkins was his cellmate. He further made clear his intent to "whoop" Jenkins. The district court could infer that that was the answer Davenport sought—she responded that she loved Durden and told him to be careful.[12]

Davenport also argues that there was insufficient evidence to establish that Jenkins had any involvement, either as a participant or a witness, with the investigation of this case. He was not named as a witness and his name finds no mention in the record outside of the corrections officer's testimony that Durden and Jenkins were involved in a physical fight. The guidelines enhancement thus does not apply, she argues. The government retorts that such proof is unnecessary. "It is enough that Davenport believed that Jenkins was an informant and that she asked Durden to act on that belief." The government cites no authority for this proposition, and insofar as we can tell, we have not addressed this issue. The government's argument ostensibly comports with the text of U.S.S.G. § 3C1.1, which is focused on the offender's

---

[12] The district court could also infer that Davenport knew there was an ongoing criminal investigation. Just ten days before Davenport's call with Durden, Davenport was told that Durden and Morris had been arrested and her assistance was requested.

intentions and not on whether a potential witness actually appears at trial. That being said, Davenport's argument is not frivolous.

Even so, she failed to preserve this issue. Our review is thus for plain error. *United States v. Aderholt*, 87 F.3d 740, 743 (5th Cir. 1996). Given that this is a question of first impression and that the text of the sentencing guideline does not plainly support Davenport's position, we reject Davenport's argument that the district court committed a clear or obvious error. *See United States v. Vega*, 332 F.3d 849, 852 n.3 (5th Cir. 2003) (concluding that any error committed by the district court was not plain or obvious because this court had not previously addressed the issue). We accordingly leave Davenport's sentence intact.

## CONCLUSION

For the foregoing reasons, each defendant's convictions and sentence are **AFFIRMED**.